THE STATE OF IOWA V. DAVID R. WRIGHT, Appellant.

**Evidence:** ACCIDENTAL SHOOTING. Where it was contended as a defense to a prosecution for homicide that the shooting was accidental, it was error to refuse to allow defendant to show that he carried his revolver and money in the same pocket, and, on being requested by the barkeeper to pay for certain drinks, he attempted to get his money and took the revolver from his pocket, and that it was accidentally discharged.

*Same:* Where it is contended by the defendant in a homicide case that the shooting was accidental, it is error to exclude evidence as to whether the defendant pointed the revolver at the time the shot was fired.

CONTRADICTION AND IMPEACHMENT. It is error in a homicide case to refuse to admit evidence that a witness for the state made contradictory statements elsewhere.

*Same.* It is error in a homicide case to refuse to admit a written statement made by a witness that he thought defendant crazy at the time of the homicide, and that he looked like a maniac, when the testimony of the witness contradicts such statement.

*Same.* Where a witness for the state in a homicide case testifies that statements in writing signed by him which are in conflict with his testimony were signed by him without knowing the contents thereof, it is error to refuse to admit evidence that it was read to him twice before he signed it.

*Same.* Where a witness in a murder case testifies to the transaction in the saloon when the homicide occurred, it is error to refuse to permit the defendant to inquire if he had not stated in a certain time and place, that when defendant entered the saloon he went out; since it is laying the foundation for an impeachment on a material matter.

DECLARATIONS: *Opinions.* Dying declarations that deceased did not believe that defendant intended to kill him are not admissible in a prosecution for homicide, since they are the mere statements of an opinion.

EXPERTS. Where no expert witnesses in a homicide case are permitted to describe the defendant's appearance and action some two or three hours before the killing, it is error to refuse to allow them to state their opinions, based on such facts, as to whether defendant was in his natural state of mind.

SAME.  *Insanity.*  Where the insanity of a defendant is in issue, questions asked a non-expert witness, relating to the health of the defendant and his appearance and physical condition, are not objectionable, as calling for conclusions.

INSANITY AND EPILEPSY AS DEFENSES.  Where it is in issue in a homicide case whether defendant was intoxicated or in an epileptic fit at the time of the commission of the crime, and a physician testified, in an answer to a hypothetical question which covered both the epileptic symptoms and evidence of drunkenness, that he would state the case as an epileptic attack, it was not error to strike out an answer that it was not drunkenness, since it did not strengthen the previous answer.

SAME.  Where it is contended by the defendant, in a prosecution for homicide, that the crime was committed while in an epileptic fit, and there is evidence that he was affected by an epileptic attack had by his sister, and a physician testifies that he had treated defendant's sister for epilepsy, it was error to refuse to allow him to state the time of such treatments.

SAME.  On the trial of a homicide case, where it was in issue whether the killing was done while the defendant was in an epileptic fit, the defendant was shown to have been an epileptic.  It appeared that his sister had had a fit that morning and that he carried her to a cot, and became very pale, and his eyes looked unnatural; that defendant contemplated going on a certain trip that day, and his father arranged for an uncle to go with defendant.  *Held*, that it was error to refuse to allow the father to testify why he sent the uncle with defendant.

SAME.  Where insanity is relied on as a defense to a prosecution for homicide, it is error to reject testimony that defendant was subject to epileptic fits before the shooting, since such fits tend to produce insanity.

SAME.  Where insanity is relied on as a defense in a homicide case, it is error to refuse to allow the defendant to show that on the day of the crime, and at other times, his talk was disconnected and incoherent, and he had a crazy look in his eyes, and that he was absent-minded, and to refuse evidence as to his general health and conversations, and his mental and physical condition, before and after the crime.

SAME.  Where a witness in a homicide case, in which the defense of insanity is raised, testifies as to statements made by defendant after his arrest, and as to his crying when told that

he had shot a man, it was error to exclude evidence that he stated that he remembered nothing about the shooting, and that his grief appeared genuine, since the defendant was entitled to the whole conversation and transaction.

SAME. *Instructions.* Where there is a question whether defendant was temporarily insane or intoxicated at the time of the commission of the homicide, and there is evidence that his mental condition was caused by epilepsy, and that the attack might have been produced by a drug in liquor given him, an instruction that intoxication, although it rendered him unconscious of his acts, was not a defense, should be modified by an instruction that, if the attack was produced by epilepsy or the drug in the liquor he was not responsible therefor.

DRUNKENNESS AND EPILEPSY. Where it is in issue in a homicide case whether the defendant was intoxicated or in a fit of epilepsy when the crime was committed, it is error to refuse evidence of defendant's appearance, color of face, etc., when drinking and shortly thereafter.

SAME. On a prosecution for homicide, it is error to refuse evidence offered by the defendant as to whether he had been drinking, and as to whether he appeared intoxicated at or prior to the shooting, or whether he appeared angry at such time.

REPUTATION. To the question whether witness knows the general reputation of defendant for "peace and quiet" an answer "I have always understood it to be good," while not a direct answer, may properly be left in the record.

WITNESSES: *Leading questions.* Where a witness for the defense in a homicide case is unwilling, it is error to refuse to allow leading questions to be asked him on his direct examination, and he may be asked if he had not made certain statements to defendant's attorney.

*Examination.* It is not error in a homicide case not to allow a witness to answer a question when he has answered substantially the same question.

Jurors: CHALLENGES. Error in overruling a challenge to a jury in a criminal case, and in sustaining an objection by the state to a question asked another juror, is not ground for reversal, where it is not shown that either of the men served on the jury, or that defendant exhausted his peremptory challenges.

New Trial: MISCONDUCT OF JUROR. Affidavits of various persons filed in support of a motion for a new trial for the misconduct of a juror, stated that the juror had stated, at various times

before the trial, that defendant belonged to a gang of toughs, and that any one who carried concealed weapons ought to be hung and that if he was on the jury he would favor conviction. Such statements were denied by the juryman, but he made similar statements in the jury room, and was strongly in favor of conviction. *Held*, that it was error to refuse a new trial.

SAME:    *Estoppel to deny oath.*  Where a juryman on his examination makes false statements that he has not formed or expressed any opinion relating to the guilt or innocence of the defendant, and has no opinion thereon, the state will be estopped from resisting an application for a new trial on the ground that he was not sworn when he made such statements.

*Appeal from Appanoose District Court.*—HON. M. A. ROBERTS, Judge.

THURSDAY, DECEMBER 20, 1900.

THE defendant was tried on an indictment charging murder in the first degree. He was convicted of manslaughter, and appeals from a judgment thereon.—*Reversed.*

*C. F. Howell* for appellant.

*Milton Remley,* Attorney General, for the state.

SHERWIN, J.—The indictment charged the defendant with murder in the first degree. Under the general plea of not guilty, the special defenses of insanity produced by epilepsy and of accidental shooting were interposed. The record before us is very large, and the assignments of error which are argued number some 75 or 80, a large proportion of which relate to rulings upon the introduction of the testimony of a great number of witnesses. It is hardly possible to separately discuss each of these rulings, and, in our disposition of this branch of the case, we will group them as far as possible, but will endeavor to so state our conclusions regarding them as to leave no doubt as to the points decided.

I. Complaint is made of the overruling of a challenge to one of the jurors, and of the ruling sustaining an objection by the state to a question asked another. No prejudice is shown in either case. It is not shown that either of these men served as jurors, or that the defendant had exhausted his peremptory challenges. *State v. Davis,* 41 Iowa, 311; *State v. Brownlee,* 84 Iowa, 473.

II. One Morman, who was sworn for the state, claimed to have been present at the time the fatal shot was fired. He attempted to detail the action of the defendant and others in the saloon where the transaction took place. On cross-examination he was asked if he had not stated, at a certain time and place, to which his attention was called, that when the defendant first went, into the saloon he went out. An objection that this was not impeaching evidence was sustained. It was laying the foundation for impeachment on a material matter, and should have been received.

The same witness had previously signed a written statement as to the transaction as he saw it, and as to the appearance and actions of the defendant at the time. This was admitted in evidence, but, on motion, the court struck therefrom the statement that witness thought defendant was crazy, and that he "looked like a maniac." The language stricken out directly contradicted the effect of the witness' testimony on the subject, and was competent for that purpose. The defendant also sought to show contradictory statements made by Morman and by Darrah, another witness, and by Hampton, another witness, in the presence of one Talbott. This was denied, and was error. They all related to the transaction, and it was not for the court to say that inconsistencies in statements, even though slight, were not material; and, as a matter of fact, some of the statements which the defendant attempted to prove were squarely contradictory of the testimony of these witnesses given on the stand.

Defendant proved that the written statement signed by Morman was read over to him twice before he signed it. This was stricken out on motion of the state. Morman had testified in substance, that he did not know what he signed. This testimony was competent on that question, and should have been left in the record.

Defendant offered the evidence of a number of non-expert witnesses tending to show his physical and mental condition before and on the day in question. One question was whether, in conversation on that particular day, his talk was connected or otherwise; another inquired as to whether his general conversation was connected and coherent; another as to absent-mindedness; another as to his looking bad at the particular time in question, and as to whether he had a crazy look in his eyes; and another as to his health in general. This was all either not received or stricken out. Evidence was also tendered showing that defendant had had epileptic fits after the shooting occurred, and one either just before or after, which, does not certainly appear. This evidence was rejected. Alienists universally recognize epilepsy as one of the most frequent causes of mental disturbance, and it is said: "Recent investigation, conducted by men of eminent sagacity and great opportunities of observation, have led to the conclusion that epilepsy produces, not only general moral prostration, but anomalies in the entire moral and spiritual system; and, although the malady sometimes co-exists with great intelligence, yet the patient retains, not only during the attack, but for an indefinite period afterwards, but an imperfect use of his faculties." Wharton & S. Medical Jurisprudence, section 470. The possible effect of epilepsy on the general mental condition, as announced above, is within the knowledge of all courts who have come in contact with the disease in the trial of cases involving mental unsoundness. In determining the mental condition of a person at a given time, it becomes of the utmost importance to know his mental condition before

that time, and to know also the effect of previous attacks of the disease, and whether or not they have left traces "of an alteration of the intellectual functions." And, indeed, we take it to be the rule that, in all cases involving the question of mental capacity, it is competent to go into the minutest details of the personal history of the one who is claimed to be mentally afflicted. Cases innumerable might be cited in support of this position, but we shall content ourselves with citing a few only: Buswell, Insanity, section 231; *State v. Felter,* 25 Iowa, 67; *Bever v. Spangler,* 93 Iowa, 576; *Ross v. McQuiston,* 45 Iowa, 145; 16 Am. & Eng. Enc. Law (2d ed.) p. 614, and cases cited. The questions asked these witnesses were all as to facts, and did not ask for conclusions. *Parsons v. Parsons,* 66 Iowa, 754; *Yahn v. City of Ottumwa,* 60 Iowa, 429; *Bailey v. City of Centerville,* 108 Iowa, 20. It was also proper to show his physical and mental condition after the transaction in question. Buswell, Insanity, *Ross v. McQuiston,* and *Bever v. Spangler, all supra.*

As we have before stated, one theory of the defense was that the shooting was accidental. In support of this theory, the defense offered to show that the defendant carried his revolver and money in the same pocket, and that when about to use money that same day, at other places, he had taken the revolver out of this pocket. This evidence was refused on the ground that it was incompetent and immaterial. In our judgment, it was competent and very material. The evidence tended to show that the bartender asked the defendant to pay for drinks that he had ordered, and that in response thereto the defendant took the revolver from his pocket, and that it was immediately discharged, and the fatal wound inflicted. It was evidence directly bearing upon the theory of an accident, and should have been received.

It was also error to exclude testimony of defendant's witnesses, and testimony elicited on cross-examination of the

state's witnesses, as to whether defendant had been drinking before on that day, and as to whether he appeared intoxicated at or prior to the shooting, and as to whether he appeared angry at the time. Under the repeated holding of this court, the evidence was competent. See the cases heretofore cited.

It was also error to exclude testimony as to whether the defendant pointed the revolver at the time the shot was fired, as it directly bore upon the theory of an accident.

One of the questions for the jury to determine was whether the defendant was drunk or in a fit of epilepsy when the shot was fired. The testimony of James Parker was offered to show defendant's appearance, color of his face, etc., when drinking, and within a short time thereafter. This was improperly refused. *State v. Huxford,* 47 Iowa, 16.

The defendant's witnesses Climie and McConaha were permitted to describe his appearance and actions some two or three hours before the shooting was done. Based upon the facts narrated to the jury, they were asked their opinion as to whether defendant was in his "natural state of mind" at the time they spoke of. This evidence was rejected, and in this there was error. *State v. Winter,* 72 Iowa, 627; *Parson v. Parson,* 66 Iowa, 754.

Sheriff Climie testified for the state as to certain statements made by the defendant soon after his arrest, and as to his crying when told he had shot a man. The defendant was entitled to the whole conversation on cross-examination, and it was error to exclude his statement therein that he did not remember a thing about the shooting. The witness should also have been allowed to say whether the grief exhibited by defendant appeared genuine or feigned.

Alf. Morman was called by the defense, and testified that he was present at the time of the shooting, and that the

defendant looked "queer"; "had a queer look on him." Counsel asked several questions as to whether his eyes appeared steady or otherwise. These were ruled out as leading. The witness was then asked if he had not shortly before stated to counsel that the defendant's eyes had a twitching or rolling motion at the time referred to. This was also ruled out. The record discloses that the witness was not a willing one, and this line of examination should have been permitted. *Spaulding v. Railway Co.*, 98 Iowa, 205.

It appeared in evidence that one of the defendant's sisters had a fit of epilepsy in the morning of the day the shooting occurred, and that the defendant caught her as she was about to fall and carried her to a cot; that he became very pale while doing so, and that his eyes looked unnatural. His father had arranged for him to leave home that morning to buy some hogs. After the sickness of the daughter, the father had an uncle go with the defendant on the contemplated trip. He was asked why he did so, and was not allowed to answer. The defendant was the subject of epileptic convulsions, which fact was known to the father. He should have been permitted to state why he sent another man with the defendant that morning.

The defendant showed by Dr. Reynolds that he had treated defendant's sister Ollie for epilepsy, and sought to show when, but was not allowed to do so. This was error.

The complaint that Dr. Reynolds was not permitted to answer a hypothetical question put to him is not well founded. An examination of the record shows that he answered practically the same question, and subsequently gave his reasons therefor. The same is true of the contention that he was not allowed to testify as to the "signs" defendant told him he had. He did testify to that fully and without objection.

Dr. Severs was asked a hypothetical question by counsel for defendant covering both epileptic symptoms and evidences of drunkenness, and was asked to state his opinion as to defendant's condition. His answer was: "I would diagnose his case as an epileptic attack. He was evidently insane. Epilepsy done it." The next question immediately following the answer was: "Q. Not drunkenness? Ans. No." This answer, "No," was stricken out on motion, and in this there was no prejudice. The previous answer was full and distinct, and the second question and answer did not, and could not, help it any.

The further criticism, that this same witness was not allowed to answer certain questions, is hypercritical. An examination of the record shows the contrary to be true. This is true, also, as to the testimony of Drs. Bowen and Brown. They answered the questions put to them substantially in all cases complained of, except the question as to Dr. Bowen's experience with certain phases of epilepsy. He had already stated the ultimate fact to be true, and, when asked if he knew that from personal experience, he was not permitted to answer. His answer should have been received, but the ruling was not prejudicial.

Upon the cross-examination of one of the state's witnesses, and upon the direct examination of one of his own, the defendant sought to show that the deceased had stated, after he realized that his wound was mortal, that he did not think the defendant intended to shoot him, and, further, that he thought defendant was crazy. This testimony was not received. These statements were not a part of the *res gestae,* and, if admissible at all, must have been so under the rule governing dying declarations. Declarations made under a solemn sense of approaching death are only competent as to facts which the witness might testify to if living. The statement that he did not believe defendant intended to shoot him is an opinion merely, and would not be received from a living witness. The statement that he thought the defendant crazy was also an opinion to which he

could not testify without giving the facts to the jury upon which he based his opinion. There is nothing in the record tending to show that this was his deliberate opinion, based on any facts which he had recited. We are therefore satisfied that the evidence was properly rejected. See 10 Am. & Eng. Enc. Law (2d ed.) 377; 1 Wharton, Criminal Law, section 678; 1 Greenleaf, Evidence, section 159.

A witness was asked if he knew the general reputation of the defendant for "peace and quiet." He answered, "I have always understood it was good." This answer was stricken out. While it was not a direct answer to the question, it might well have been left in the record.

It is contended that the defendant was not permitted to state how long it was after a drink was given him in the saloon before he felt a "sensation." The defendant answered this question later in his examination.

Many more complaints are made of rulings on evidence, but they are not deemed of sufficient importance to require comment. We are forced to the conclusion, however, that the defendant was unduly restricted in his examination and cross-examination of witnesses in some instances; but the trial was a long one, we judge from the record, and it would be strange indeed if the court did not lose sight, for the time being, of some of the evidence that had gone into the record.

Complaint is made of the court's refusal to permit the defendant to call a witness after opening arguments had been made on both sides. This matter was largely within the discretion of the court, and is not likely to happen on a retrial of the case.

In the defendant's assignment of error numbered 66 he assails the fifteenth and sixteenth paragraphs of the court's charge. They are as follows: "(15) An act committed by a person while in a state of voluntary intoxication is none the less criminal by reason of his having been in such condition. Voluntary intoxication is no excuse for crime, even when so extreme as to make the

person unconscious of his acts or to create a temporary insanity. A man who, by means of intoxication, voluntarily puts himself in a condition to have no control of his actions, must be held to intend the consequences of his acts. He cannot avail himself of his intoxication to exempt him from any legal responsibility that would attach to him if sober. But it is nevertheless proper to consider the fact of defendant's intoxication, if it be a fact, when you come to consider the question of criminal intent, and of malice aforethought, deliberation, and premeditation, because these relate to a condition of the mind. (16) And on these questions it is proper for you to consider the fact, if it be a fact, that the defendant was afflicted with a disease of the nervous system known as 'epilepsy,' and the fact, if it be true, that the mental powers were impaired thereby, for the purpose of determining the extent of his intoxication, if any, and his power to design, deliberate, and premeditate; but if you find that the defendant was sane at the time of the alleged offense, and intoxicated, it could not reduce the crime below manslaughter, and then, only, should you find him so intoxicated as to render him unconscious of what he was doing, and incapable of entertaining malice aforethought and criminal intent; but if intoxicated, and he still possessed sufficient mind and consciousness to know what he was doing, and entertained malice aforethought, the intoxication would be no excuse." It is apparent to the writer that the court's purpose in these two instructions was to give the jury the rule relating to the effect of intoxication alone; but the question of the defendant's insanity, produced by epilepsy, was one of the main defenses presented for the consideration of the jury, and there was evidence in the case tending, at least, to show that the use of intoxicating liquor might bring on such a nervous attack. There was also evidence tending to show that immediately before the shooting the defendant had been given drugged liquor, and the possible effect of this in producing an epileptic explosion was also in the record. If the

·defendant was at the time temporarily insane, and his mental condition was caused by epilepsy, and if the attack may have been produced by the drug in the liquor given him, it cannot be said that he would be responsible for his act, though there may have been intoxication. While we are not prepared to say these instructions were prejudicial to the defendant, in view of others given, we still think they might well have been more explicit and full, in view of the peculiar facts presented in this case.

An instruction was asked by the defendant (No. 26) ·on the question of voluntary intoxication which we think should have been given in connection with the instructions complained of. It is as follows: "(26) You are instructed that if you find that the defendant, at the time of the alleged shooting, was intoxicated, but that his intoxication had been produced by the artifice or fraud of the deceased or other persons, then, and in such event, it would not be a voluntary intoxication in the eye of the law; and in such ·event, if you so find, if the intoxication was to such an extent as to absolutely destroy the reason for the time being, so far as his knowledge of his acts is concerned—that is, place the defendant in such a mental condition that he had no knowledge of the nature or character of his acts, or whether right or wrong—then, and in such event, you are instructed that you should acquit the defendant." We think this states ·correctly the law relating to voluntary intoxication, and that the mention made of the subject by the court in its own charge was not broad and full enough to cover the fact here presented.

The nineteenth paragraph of the court's charge is complained of as being too narrow and restrictive. It is undoubtedly true, as contended by counsel for defendant, that epilepsy, and its effect on the faculties, is obscure in very many cases, and not easily discernible by non-experts. This ·case is also in many respects similar to to *State v. Town-*

*send,* 66 Iowa, 741, but the instruction given here did not attempt to limit the weight to be given the expert testimony, as they did in that case, and so far as it went we think it correct. The opinion of a medical expert, to be of value, must, of necessity, be founded upon conditions proven on the trial, and this was, in effect, the only limitation placed upon the evidence given. We think the court might properly have given an instruction covering the case more fully, but do not think it was prejudicial error not to do so.

Many instructions were asked by the defendant intended to present the case in its various aspects. The correct principles contained in them were given in the court's own charge fully and fairly, except as herein noted, and we discover no reversible error in refusing the others asked, though we think the court might well have called the jury's attention to the question of lack of motive on the part of the defendant. While not controlling, it was a circumstance which might be given weight by the jury under the defenses interposed.

A new trial was asked based on the misconduct of jurors after the case was given to them, and also on the ground of false and misleading statements made in their examination as to qualifications. The record presents an almost inconceivable condition respecting the juror Martin.

The affidavits in support of a motion for a new trial set forth statements made by him after the shooting, and before being selected as a juror in the case, substantially as follows: "That the Wright gang were a tough set of fellows anyway"; and "that any one who carried concealed weapons ought to be hung on general principles." That "the Wright boys are all high strung," and "carry revolvers, and will shoot when they get mad." "There ought to be something done with those fellows who carry revolvers; if left to me, I would send some of them up." "If I was on Davy's jury, I would send him as far as I could." "They oughtn't to have cleared that man Moore." While talking of the case with an acquaintance, who stated that the defendant was

crazy, Martin said: "Oh, Cannon! it is just like the Wrights to shoot when they get mad. I have talked with several of them fellows over there who claim to know about the shooting, and it is my firm opinion he was no more crazy than you or me. Of course, he would say that just to get out of that. This shooting will have to be stopped. They ought to send him to the 'pen' for life at least." And people ought not to carry revolvers. From what I have found out about the case, I have made up my mind that Dave will have to be sent over the road. If I was ever on jury, I could never clear him." These statements were not all made to the same witnesses, but are contained in affidavits made by eight different persons. Other affidavits related to disparaging remarks made by Martin about the defendant's evidence, as the trial was going on. It is true Martin in his affidavits swears that he never made any of these statements; but affidavits were also filed showing his efforts in the jury room to secure a conviction, in which are set forth his statements to some of the jurors, and which are very similar to some of his statements of fact as to the Wrights in general and the defendant in particular, herein given. In addition to this, the record fails to show that the men and women who made these affidavits are not entitled to belief; hence, giving to the discretion of the trial court the widest latitude permissible in criminal cases, we are of the opinion that the record fully justifies the claim against juror Martin.

On his examination as to his qualifications to sit as a juror, he answered that he "had not formed or expressed any opinion relating to the guilt or innocence of the defendant," and "have no opinion now" relative thereto, and "have no impression in regard to this case, one way or the other." The force of these false answers is now sought to be broken by showing that Martin was not under oath when they were given. This is an anomalous position for the prosecution to take. If the juror was not sworn as to his qualifications, it was undoubtedly an over-

sight on the part of the court, counsel, and clerk. · The presumption below was, and is here, that he was sworn. But, in our judgment, the truth as to that is not material in this case. If the defendant supposed the juror had been sworn before his examination, and relied upon his statements in accepting him, the state should not now be permitted to say that a failure to swear the juror shall deprive the defendant of his constitutional right to trial by a fair and impartial jury. That he did not have a fair and impartial jury to hear and decide his case is very evident, and for this reason alone a new trial should have been granted by the court below. For the errors pointed out herein, the case is reversed, and remanded for a new trial.—REVERSED.