STATE OF IOWA, Appellee, v. ALONZO BROOKS, Appellant.

**HOMICIDE: Irrelevant Testimony as Basis for Sentimental Argument.**
1  Irrelevant testimony in a murder case by the wife of deceased to the effect that she was pregnant is improper. While such testimony may not constitute *reversible* error, it is error.

**HOMICIDE: Evidence—''Purpose'' in Meeting Party—Assumption of**
2  **Truth.** Evidence by the wife of a deceased in a murder case relative to the *purpose* of herself and husband and others in meeting defendant at the time of the killing reviewed, and held to constitute reversible error, because (1) wholly irrelevant, (2) incompetent,

and (3) assuming the truth of a fact very prejudicial to defendant, of which fact there was no competent evidence.

**HOMICIDE:** Dying Declarations—Showing in re Competency. Dying
3   declarations of the deceased are not admissible in criminal causes, in the absence of clear proof that the deceased had abandoned all hope of living, and was fully conscious at the time of making the declarations of impending death. Evidence held insufficient to justify admission.

**HOMICIDE:** Dying Declarations—Permissible Scope. Dying declara-
4   tions must be confined in their recitals:
        (1)   To matters relating to the identity of the parties involved in the immediate killing; and
        (2)   To matters constituting the *res gestae* of the killing.

**EVIDENCE:** Res Gestae—Mere Narrative. No fixed time or distance
5   from the main occurrence can be established, to determine what shall be considered a part of the *res gestae*. Instinctiveness—spontaneity—is the ever-present requisite. A mere narrative of a past occurrence cannot be entertained. A statement by an accused as to how the homicide had occurred, made some 30 minutes after a homicide, and after he had gone some distance to his home, held a mere narrative, and inadmissible.

**HOMICIDE:** Self-Defense—Denial of Right to Act on Appearance.
6   An instruction that an accused may not justify a shooting on the ground of self-defense unless he was actually assaulted by the deceased is reversibly erroneous, because denying to the accused, as an ordinarily prudent person, the right to act on the *reasonable appearance of things*,—the evidence showing that the shooting occurred at nighttime, and tending to show that the accused had reason to expect a murderous assault upon him by the deceased.

*Appeal from Linn District Court.*—JOHN T. MOFFIT, Judge.

JANUARY 10, 1922.

TRIAL on an indictment for the crime of murder in the first degree. Jury returned a verdict finding defendant guilty of murder in the second degree. Judgment was entered committing defendant to the penitentiary at Fort Madison, Iowa for the period of his natural life. Defendant appeals.—*Reversed.*

*F. A. Heald, G. P. Linville, Ray J. Mills, M. F. Fields, Geo. H. Woodson,* and *R. S. Milner,* for appellant.

*Ben J. Gibson,* Attorney General, *B. J. Flick,* Assistant Attorney General, and *H. K. Lockwood,* County Attorney, for appellee.

DE GRAFF, J.—About 6 o'clock on the morning of April 10th, 1919 the defendant Brooks shot and killed Harry Flippings in Cedar Rapids, Iowa. Both parties were negroes and were employed at the Douglas Starch Works. The defendant's work in the boiler room commenced at 6 and Flippings's at the pumping station at 7 o'clock in the morning. There is no conflict in the testimony that the shooting occurred before daybreak and at a time when it was fairly dark. Two witnesses (husband and wife) by the name of Tenant testified that on the morning in question they met Flippings and his wife about 5:30 on First Street near the entrance to the Douglas Starch Works. This was prearranged and had for its object the meeting of Brooks on his way to work. These four people had waited about 30 minutes behind some large posts near a watering tank and were about to leave when Brooks was observed a short distance away.

Tenant testified:

"When Brooks got about four feet from us Flippings made two steps towards him and Brooks pulled a gun and fired. * * * There were no words spoken by Brooks and Flippings or any conversation between them before Brooks fired. * * * We met there about 5:30 and waited until about 5 minutes of 6 before we saw Brooks. We waited right there at the water tank and those large posts until Brooks came."

On cross-examination Mrs. Tenant testified:

"I was not the leader of the party. Flippings was the leader and he lead us down to that location right beside that water tank where there is a couple of big posts. We stopped right there all four of us. It must have been about a quarter to 6 and we stayed there until Brooks came along."

Mrs. Flippings testified:

"We left the house at 15 minutes after 5. It was just barely getting light at that time. When we met Mr. and Mrs. Tenant in front of the starch works we went on to the place where the shooting occurred. * * * It was decided among ourselves that we

would go down and meet Brooks down there. * * * The three of us stood still and my husband walked out and took two steps towards Brooks. * * * I went with my husband to that place. He took me to that place that morning. We got there between half past 5 and 6 o'clock. I was not in the habit of going to work with my husband in the morning. I don't remember of me and my husband ever getting up in the morning that early before while we roomed at Raspberrys.''

There had been some ill feeling between Flippings and Brooks prior to this time and the record discloses one altercation between them. On the evening before the tragedy Flippings visited the rooming house of the defendant for the purpose of having an interview with him but he was prevented from so doing by the landlord. Joyce the landlord testified that on that night he saw a gun in the possession of Flippings. There is no dispute in the evidence and several witnesses testified that Flippings was in the habit of carrying a gun. The testimony of the three eyewitnesses to the tragedy is to the effect that Flippings was unarmed that morning. Some feeling had been engendered between the defendant and the deceased by reason of the claim on the part of the deceased that the defendant was attempting to win the favor of Flippings's wife. Joyce the landlord testified:

''When I saw him at the Starch Works with a gun in his possession he (Flippings) made the statement that he couldn't come over to my house any more for he said Brooks had to flirt with his wife. I said 'that is funny, I'll see Mr. Brooks about it when I get home.' Brooks passed while I was talking to him and he said here comes the black s—— of a b—— now. I ought to take a shot at him. Brooks was going towards home and spoke as he passed. Flippings did not speak to Brooks. He said if he heard any more talk he was going to take a shot at Brooks.''

Joyce testified that he told Brooks the things that Flippings had said. As a result of what Joyce told Brooks the latter went to Flippings and asked him why he didn't come straight to him. This testimony was given by Joyce in relation to a conversation which he subsequently had with Flippings. The latter told Joyce:

"Brooks said he was a man and I told him I don't think you are no man. I think you are a dam dirty cur and that Brooks took a smack at him; if I had had my gun I would have shot a hole through him."

This conversation was also reported to Brooks by Joyce the same evening. The shooting happened on Thursday morning and on Wednesday evening as heretofore stated Flippings went to Brooks rooming house to see Brooks. Joyce the landlord told Brooks not to go out. Joyce testifies that Flippings told him that he came over to settle differences between Brooks and his (Flippings') wife."

"I told him if there was going to be any fighting I would do it myself. Flippings said if he is a man he will come out. I said I informed him not to come out. Flippings said if he don't come out I will lay and get him in the morning. I told him that was his business that he wasn't going to start any trouble there."

After Flippings left, Joyce and the defendant talked the matter over and Joyce testifies that Brooks seemed to be "pretty frightened and nervous." Brooks did not leave his room that night and canceled an engagement that he had with a lady friend. Mrs. Joyce was home on the evening in question and corroborated her husband in the more important matters. The foregoing evidence in brief affords the setting in relation to the characters and the incidents of the tragedy which resulted in the indictment of Brooks.

The primary errors assigned by appellant involve: (a) The admission and rejection of evidence, and (b) The instructions given and refused by the court. We will first note the rulings of the court on matters of evidence.

I. (1) Mrs. Flippings, wife of the deceased, was asked: "Have you any children?" To which she answered: "I have none living but I expect to be confined about the middle of next month." Timely motion was made based on sufficient grounds to strike the answer. This motion was overruled. The latter part of the answer was purely voluntary and the only recourse counsel had was to move to have same stricken. The answer may seem innocent, but able counsel in a criminal

1. HOMICIDE: irrelevant testimony as basis for sentimental argument.

prosecution would make the most of such a situation and the pathos of argument furnished by the theme of the "unborn child" could easily, and as contended, did arouse the passion and the prejudice of the jury.

We would not reverse for this alone but take this opportunity to preclude further reference to such matters upon a retrial.

(2)    Mrs. Flippings accompanied her husband on his last walk in the direction of the starch works on the morning of the tragedy and was permitted to answer this question:

2. HOMICIDE: evidence: "purpose" in meeting party: assumption of truth.

"Q.    Now tell the jury what you wanted to meet Brooks for."

After proper objection was entered by defendant which was overruled by the court, she answered:

"We went down there to meet Brooks to have him—well, tell us—to straighten out a story then, that he had told my husband, saying that he was paying Mrs. Tenant to get me for him."

Motion was made to strike the answer for the reasons stated in the prior objection and for the further reason "that it assumes that defendant Brooks had told them the story along the line suggested by the witness in her answer." The motion was overruled by the court. It should have been sustained.

What Mrs. Flippings' purpose was in going with her husband was wholly immaterial, and she could not properly testify as to the purpose of any other person. No competent testimony in this record discloses that Brooks was paying money to Mrs. Tenant to secure the favor of Mrs. Flippings.

In the prosecution of a criminal case the State should not be permitted to do indirectly what may not be done directly. In the last analysis the answer of this witness is an insinuation, and obviously prejudicial to the rights of the defendant.

(3)    The court admitted as a dying declaration over the objection of the defendant a statement written and signed by the deceased as follows:

3. HOMICIDE: dying declarations: showing *in re* competency.

"April 11, 1919.    My name is Harry A. Flippings, 82 19th Ave. W.

"My wife has told me three different times about Brooks trying to force himself on her offering to buy her

clothes.  The last time was Sunday at A. R. Joyce's house. * * *

"The next morning as I was going through the tunnel Brooks stopped me and wanted to know what I had said to Joyce. Then he said he had been paying Mrs. Tenant money to get my wife for him. * * *

"We went to Brooks' house, but did not get to see him that night and went to see him the next morning.

"The evening of the 9th when we went to his house, my wife had my revolver, I told her I didn't need it and told her she should have left it home. When we got home I told her to put it away because I didn't want to get into any trouble with him.

"Then the next morning we all met at 9th Ave. and H St. to see Brooks and have a talk with him. I or no one else in the party had a gun.

"When I saw Brooks coming I taken about two steps toward him, not saying a word, he pulled out his pistol. I backed off and started to put up my hands and he fired.

"He seemed to wait a second or two and fired again. I rolled over on my side and saw him standing over me. I then tried to crawl away and then he ran." (Signed `H. A. Flippings.)

It is for the court to determine the competency of statements claimed to be a dying declaration, and its credibility upon admission is for the jury. The only statement made by the deceased prior to the execution of the writing indicating that he was in fear of approaching and impending dissolution is found in these words. "If I am going to die I want to see my minister." The record does not disclose that the minister was ever sent for, and the statement itself is but an equivocal expression. Nothing was said by the deceased to the doctor who performed the operation relative to his dying or that he thought himself in fear of impending death. True, the doctor advised him that his wound was fatal and he would not get well and it was at this time that he made the expression quoted above. Subsequently to this statement and within an hour or two the decedent's barber visited him and at that time deceased wrote a note to the boys at the barber shop which read: "Hello boys, feeling fine. Hope to be with you soon. Harry Flippings." Police

officer McGuire was with Flippings at the time that he wrote the declaration but nothing was said to McGuire by Flippings about dying and the declaration itself contains no statement indicating a sense of impending dissolution on the part of the deceased.

A court should exercise the utmost care and caution in admitting a statement as a dying declaration. The proof must clearly show that the deceased at the time of making said statement was fully conscious of the fact of impending death. If the deceased uses language indicating he has hope of recovery or that he is not under a sense of impending death, his declaration should be rejected. The fact that the declarant realizes that he is in danger of death is not enough. The words must be spoken under solemn conviction of impending dissolution. *State v. Phillips,* 118 Iowa 660, with cases cited. The failure of the declarant to state that he is about to die is a persuasive but not conclusive circumstance in denying the right to introduce such statement. *Digby v. People,* 113 Ill. 123; *Stewart v. State,* 2 Lea. (Tenn.) 598. The evidence herein is insufficient to establish that the declarant believed himself *in spe extremis* when the statement was prepared by him. See *State v. Baldwin,* 79 Iowa 714; *State v. McKnight,* 119 Iowa 79; *State v. Schmidt,* 73 Iowa 469.

Even though further evidence should be introduced upon a retrial to render competent the statement of declarant, many of the declarations therein are incompetent and should not be permitted to go to the jury. A dying declaration must relate to such facts only as declarant would have been competent, if living, to testify if sworn as a witness in the case. *State v. Wright,* 112 Iowa 436; *State v. Perigo,* 80 Iowa 37.

4. HOMICIDE: dying declarations: permissible scope:

A dying declaration does not take to the jury irrelevant, immaterial, and incompetent statements of the declarant. Statements by declarant relating to distinct transactions and embracing circumstances not immediately connected with the homicide cannot be received in evidence. The only matters which are receivable are facts which refer to the identity of the person, and establish the circumstances of the *res gestae,* and the direct transactions from which death results. Antecedent circumstances disconnected with the *res gestae* of the

homicide are inadmissible. An examination of declarant's statement discloses the incompetency of many of the matters contained therein. What his wife told him was no part of the *res gestae*. What Brooks said to him in the tunnel is in the same category. His conversations with his wife about a revolver and his visit with his wife to Brook's house are incompetent. Briefly stated the last two paragraphs only of Exhibit 4 are competent, if the proper foundation is laid for the introduction of decedent's statement as a dying declaration.

(4) It is next contended that the court erred in sustaining the objections of the State to the following question propounded to witness A. R. Joyce by defendant's counsel:

5. EVIDENCE: *res gestae*: mere narrative.

"Now tell the jury what Mr. Brooks said when he came home at that time in that excited condition."

A like ruling was made in sustaining an objection to a similar question propounded to Anna Joyce. Subsequently to these rulings the defendant in the absence of the jury offered to prove the following:

"That when the defendant Brooks came home, to the home of this witness on the morning of April 10th between the hour of 6 and 6:30 in a nervous and excited condition he told this witness that Harry Flippings jumped out from behind posts in a dark spot on Brook's way to work and in the darkness of the morning grabbed hold of him, Brooks, and said, 'now, I've got you, and that he, Brooks, in self-defense, in order to save his own life shot at and in the direction of Flippings. That he was sorry to have had to do it but that he had to do it to save his own life, or that in substance."

The defendant offered this testimony as part of the *res gestae,* but upon objection its admission was refused by the court.

The declarations of an accused person are not admissible as *res gestae,* unless they are so connected with the main transaction and made under such circumstances as to exclude any presumption that they were premeditated or fabricated. Every case must necessarily depend upon its own circumstances. *Meek v. Perry,* 36 Miss. 190. No fixed measure of time or distance from the main occurrence can be established to determine what

shall be considered a part of the *res gestae*. The declarations must be a part of the immediate preparation for or emanations of such act and such as may not be said to be the calculated policy of the actor.

They must be something more than a mere narrative of a past occurrence and must be made at the time of the act done or reasonably near the time and must be considered as a part of the same continuous transaction. Such declarations are generally considered as the spontaneous utterance of thought created by or springing out of the transaction itself and so soon thereafter as to exclude the presumption that they are the result of premeditation and design. They are automatic in a sense and a necessary incident of the litigated act. It is not competent for an accused person to give in evidence through another witness his own account of the transaction unless such statements are to be received as admissions on his part.

*Res gestae* is independent of, and cannot be restricted or limited to the rules relating to admissions or confessions made after the commission of the act. Even though it is a self-serving declaration, if it is properly ·a part of the *res gestae,* it is admissible notwithstanding the fact that it may not be admissible as a confession or an admission.

In the instant case the testimony sought to be introduced is a mere narrative by the defendant at a time and place too remote to come within the purview of *res gestae*. It is a self-serving statement, and under the circumstances lacks spontaneity. Furthermore it may not be said that his state of mind 30 minutes after the homicide is a material fact in the case. See *State v. Jones,* 64 Iowa 349; *Hall v. State,* 40 Ala. 698; *Hall v. State,* 48 Ga. 607; *Powell v. State,* 44 Tex. 63; *State v. Tilly,* 25 N. C. 424; *Greenfield v. People,* 85 N. Y. 75; *State v. Brown,* 64 Mo. 367; *Lander v. People,* 104 Ill. 248. The court properly excluded the proffered testimony.

II.   The court in Instruction 21 told the jury:

"That the defendant cannot justify himself for the shooting on the ground of self-defense under the evidence in this cause unless he was actually assaulted on the early morning of April 10th, 1919 by Harry Flippings," and furthermore that, "If the de-

6. HOMICIDE: self-defense: denial of right to act on appearance.

fendant was not so assaulted then he was not acting in self-defense in shooting Harry Flippings.''

This instruction is erroneous under the facts of the instant case. In order to justify or excuse homicide in self-defense, it is not necessary that deceased should have made an actual assault on the defendant, if the circumstances disclosed or raised a reasonable apprehension that he was about to do so. It is necessary that the deceased shall have indicated by some act at the time of the killing a real or apparent intention to kill or inflict great bodily harm upon the defendant and thereby induce the latter to reasonably believe that it was necessary to kill to save himself. To charge that an actual assault is necessary, without further explanation is misleading and prejudicial.

The accused had the right to view the situation as an ordinarily prudent man and act upon the apparent rather than the real danger to which he was exposed. *State v. Donahoe,* 78 Iowa 486. There must be such an appearance of impending danger that the taking of life reasonably seems to be the only means of preventing the threatened injury. *State v. Shelton,* 64 Iowa 333.

If a person honestly believes, or has reason to believe at the time of the shooting, that he is in great peril and great bodily harm is about to be inflicted upon him, he has a right to act under such well grounded apprehension. The danger need not in fact exist. *State v. Fraunburg,* 40 Iowa 555; *State v. Abarr,* 39 Iowa 185; *State v. Collins,* 32 Iowa 36.

Neither court nor jury can apply the doctrine of ordinary prudence without having in mind the knowledge, conditions, and circumstances of the party called upon to act. The defendant in this case requested an instruction on self-defense relative to the threats made by the deceased against the defendant which were directly heard by the defendant or communicated to him. It was refused. An accused person is entitled to have his theory of the case explained to the jury and the law stated applicable thereto. There is no dispute that Harry Flippings is dead and that he came to his death by a revolver wound inflicted by defendant. The primary question is whether the homicide is excusable on the ground of self-defense. The dangers of the situation to the defendant must be judged from the facts

as they reasonably appeared to him and these facts must justify a reasonable belief that there existed an actual necessity to shoot to kill. *State v. Sterrett*, 68 Iowa 76; *State v. Archer*, 69 Iowa 420. The testimony shows that the deceased was a hot-tempered fellow; that he frequently carried a gun; that he made threats to kill defendant; that it was dark when the fatal shot was fired; that the defendant had reason to believe that the deceased would be in waiting for him on the morning in question, and he was in waiting and had been for a considerable time. These were proper facts for the consideration of the jury on the defendant's theory of self-defense. It will be readily conceded if the circumstances disclosed that it was daylight, and that the parties had casually met, the defendant acting as an ordinarily prudent man would not have been under such grave apprehension of bodily harm.

Other points are noted and argued by appellant but they are incidental to the propositions noticed herein, and will not recur upon a retrial. For the reasons stated this cause is—*Reversed and remanded.*

Weaver, Evans, and Preston, JJ., concur.