(No. 11601.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ISAAC BOND, Plaintiff in Error.

*Opinion filed December 19, 1917.*

1. CRIMINAL LAW—*verdict will not be set aside merely because evidence is conflicting.* A verdict will not be set aside merely because the evidence is conflicting, and in a murder case, where the circumstantial evidence against the defendant is strong and it is evident that the jury did not believe the witnesses who testified to an alibi, the judgment of conviction will not be reversed as unwarranted unless it appears from the record that said witnesses were of so reliable a character that the jury would not be warranted in disbelieving them.

2. SAME—*witness may be questioned as to occupation although business is disreputable.* It is permissible to inquire of a witness as to his or her occupation although that occupation is disreputable, as a witness engaged in an unlawful or disreputable occupation should not be permitted to appear before the jury as a person of high character and engaged in a lawful and respectable occupation.

3. SAME—*witness should not be asked if she has been arrested.* A witness should not be asked if she has been arrested and tried on the charge of keeping a house of ill-fame, but the error will not be regarded as prejudicial where her answer, uncontradicted, is that she had been arrested but was not found guilty or fined.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. CHARLES A. McDONALD, Judge, presiding.

CLARENCE DARROW, VICTOR S. YARROS, and J. GRAY LUCAS, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, for the People.

Mr. JUSTICE FARMER delivered the opinion of the court:

The plaintiff in error, Isaac Bond, colored, was indicted, tried and convicted in the criminal court of Cook county on a charge of murdering Ida J. Leegson, a white woman, and his punishment was fixed at confinement in the penitentiary

for life. A writ of error has been sued out to review said judgment.

Plaintiff in error insists the judgment should be reversed because the proof does not show him guilty beyond a reasonable doubt, and for the further reason that the court erred in admitting improper testimony.

Ida J. Leegson was an artist, art student or teacher and was also a practical nurse. She lived at 122 East Twenty-fifth street, in Chicago. On October 5, 1913, her dead body was found on the prairie in the neighborhood of Forty-eighth avenue and Seventy-first street. She had been ravished, and murdered by being choked. Her clothing was torn from her body and was scattered around for some distance. There were evidences of a fierce struggle and the body bore numerous bruises. Near the body there was a track made by a No. 11 shoe. Miss Leegson had caused an advertisement to be published in the *Daily News* on October 4, 1913, that she was a practical nurse, maternity cases preferred, and giving her telephone number. Some time after 2:30 o'clock P. M., October 4, while Miss Leegson was absent from home, there was a telephone call for her and the woman at whose house she was living answered it. A voice she recognized as that of a man inquired if there was a nurse at that place. Witness replied that the nurse was out but would be back shortly and suggested to the man that he leave his telephone address. He said his wife needed a nurse and said something about maternity; that he had come far and that he would call another nurse and if he could not get another would call again. Miss Leegson returned about fifteen minutes later and shortly after her return the telephone rang. Miss Leegson answered it. The witness heard her say, "Fifteen dollars without washing and twelve dollars with washing." She said she would come within an hour, and repeated an address given her on the telephone. She repeated, "Go by Western to Seventy-first street." She said something to the person with whom she

was talking over the telephone about a long walk after she should leave the car, and that she would have to bring a suit-case. She left witness' home to keep the engagement, and the next day witness saw her dead body at an undertaker's rooms, where it had been taken after its discovery on the prairie.

The morning of October 5 a colored man pawned for a loan with Eli A. Nierman, a pawnbroker at 3020 South State street, a lady's watch upon which was a monogram. The pawnbroker inquired of the man as to the ownership of the watch. The colored man said it belonged to his sister, whose name was Ida Leegson, but that he did not know what the middle initial stood for. He said his own name was A. J. Leegson. The pawnbroker put the watch and the pin attached to it in an envelope and placed them in a safe. The next day he saw a report of the murder of Miss Leegson in the newspapers and notified the police he had taken in a watch with the name Leegson on it and surrendered it to the police department. At the trial the woman at whose house Miss Leegson lived was shown the watch and the pin produced by the police department and identified them as the property of Miss Leegson. The pawnbroker identified them as the articles pawned to him by the colored man the morning of October 5, which was the day the body was found.

Defendant denied his guilt and sought to prove that he was in Gary, Indiana, October 4 and 5. He is a tall man,— about six feet two inches,—and has large, square shoulders and apparently rather small legs for the size of his shoulders and body.

On the part of the prosecution James E. Connolly, a car inspector for the Wabash railroad, testified that about five or six o'clock in the evening of October 4 he left his home and drove across the field to the Wabash yards. While driving he saw a colored man and a white woman on Seventy-first street coming toward him. The man was large and

powerful—about six feet tall. He gave his impression and recollection of the clothing worn by them or a part of it. The man carried a hand satchel which resembled in color and shape the one shown him at the trial as Miss Leegson's. It was about dark when the witness saw the parties. He was driving east and they were walking west. The man kept his head down and witness could not see his face. He particularly noticed the man's shoulders and thought they were as square as he had ever seen, but the lower limbs were small and did not seem in proportion. It struck witness as unusual to see a colored man and a white woman there together.

Thomas Bursach testified he finished painting his residence, 5324 Hoyne avenue, on Saturday, October 4, and while standing in front of his house, somewhere about five o'clock in the evening, a colored man came up to him. A white woman was with the colored man. The man was tall, not black but brown, and had a small black mustache. He stood within four feet of the witness and inquired where Fifty-fifth and Seeley streets were. The woman was about twelve feet away. Witness directed the colored man to the place he inquired for. He testified positively that he recognized defendant as the man he saw the evening of October 4 with the white woman. He had previously identified a picture of defendant shown him by a policeman as the picture of the colored man he saw with the white woman October 4, and later saw and identified defendant at the coroner's inquest.

Willis H. Mays, special police officer for the Wabash railroad, testified he was stationed between Seventy-fifth street and Western avenue, in the Wabash yards, and that his duties were to patrol the yards. He worked between six in the evening and six in the morning. The night of October 4 while witness was patrolling the yards back and forth, he ran across a colored man. The man had his hands in his pockets and "was a great big fellow." Witness drew

his revolver and inquired of the man where he came from and where he was going. The man said he had come from St. Louis and was going to Gary, Indiana. Witness made him put up his hands and searched him. He found three ten-cent pieces and a watch. The man told the witness a very good story, and the witness took him to the office, where he turned the light on and again questioned him. The man said he came on a freight train from St. Louis. Witness asked him what he was doing with a lady's watch in his pocket, and he said it was his dead sister's watch. After keeping him about thirty minutes witness told him to go about his business. There was a little three-pointed pin attached to the watch the colored man had. On being shown the watch and pin of Miss Leegson the witness testified the pin resembled the one attached to the watch which he found on the colored man but that he could not say as to the watch. The colored man was over six feet tall and had square shoulders. Witness looked at his face. He testified that to his best belief and knowledge defendant was the man he encountered in the Wabash yards the night of October 4.

William Maher was a motorman. On Sunday, October 5, while driving his car, he saw near the corner of Sixty-third street and Forty-eighth avenue a tall colored man who was looking at the sign on the car. When the car stopped the colored man boarded it and came out on the front platform where witness was. Witness remarked to the man about his being tall, and the man replied he was nearly six feet two inches. There was plenty of light at the time. The man asked witness if he was going downtown, and witness told him he was not; that he connected with the Archer Limits car and the man could take that car. The man got off there. He was tall, weighed about two hundred pounds, had heavy shoulders, a small black mustache, was about forty years old, and was rather yellow or copper-colored. His legs seemed small in proportion to

his body. Witness would not say defendant was the man who rode with him on the car, but testified he looked exactly like him and that he resembled him very much.

The pawnbroker with whom Miss Leegson's watch was pawned testified he could not positively identify anybody from what he observed at the time he received the watch from the colored man. He testified the man was tall, had a slight mustache and was brown,—not real black,—and was from thirty-five to forty years of age.

Michael Binkowitz was a clerk in the pawnshop. He testified he was in the room when the colored man came in to pawn the watch. He was in a window, trimming it. There was some bargaining over the amount asked by the colored man which attracted the witness' attention and he turned around and looked at the man. He testified positively defendant was the man who pawned the watch.

The foregoing is the material testimony for the prosecution to prove that the murder was committed by defendant. It must be regarded as conclusively proved that Miss Leegson was murdered the night of October 4, and that a colored man committed the crime after luring her to the place where the body was found, on the pretext that he was taking her to someone desiring her services as a nurse.

Seven witnesses, all colored, testified that defendant was in Gary, Indiana, the night of October 4, and some of them also testified he was there October 5. They testified they were able to fix the date because on the night of October 4 there was a political parade in Gary, and some of them testified defendant was asked to take part in the parade but declined, claiming that his feet were sore.

Defendant was a witness in his own behalf and testified he was forty years of age and that he wore No. 11 shoes. After leaving Tennessee, where he was born, he engaged for a time in railroading and other forms of labor. In 1910, at Cape Girardeau, Missouri, he killed a man in a difficulty over a poker game and ran away. He was captured in

Chicago, returned to Missouri, was tried and convicted of manslaughter and sentenced to the penitentiary. He was released from prison on August 2, 1913, came to St. Louis and communicated with John Collins, of Gary, Indiana, who kept a saloon there, with a restaurant in the basement, where gambling also was carried on. Collins sent him money and he went to Gary and worked in the basement of Collins' saloon until September 28, 1913, when he went to Chicago, where he stayed until October 1, when he again returned to Gary. The restaurant in the basement of the Collins saloon was conducted by a man named Parker and a woman who testified at the trial that she was Parker's wife. Defendant testified to being in the restaurant frequently during the afternoon and night of October 4 and to seeing the Parkers there and other persons named at other places. He remembered the parade and that he did not go in it because he had sore feet. He testified to visiting different places in Gary the night of October 4 and to meeting a number of persons whom he named. October 5 he had breakfast at a restaurant in Gary and all day went back and forth between a place he called a "club" and the saloon. On Monday, October 6, he went to Chicago and to the home of Mrs. Neiss to get some clothes he had left there on a previous visit. From there he went back to Gary. After arriving in Gary he was arrested and taken before the chief of police.

The abstract is very imperfect, but as we understand it the newspaper account of the murder and the description of the man who pawned the watch of the murdered girl caused suspicion to be directed toward defendant, and for that reason he was arrested and taken before chief of police Martin at Gary. He was there questioned by the chief and told the chief to call up certain places and persons for the purpose of establishing that he had been in Gary the last five or six days. Defendant had formerly been a deputy of Chief Martin. Defendant was detained about a half hour and then released. He remained in Gary until November, when he

went to Chicago. On the morning of January 14, 1914, while in bed at the home of Mrs. Neiss, she came in and called his attention to an article in the newspaper mentioning his name in connection with the murder of Miss Leegson. He got up, dressed, and without waiting for his breakfast went to the pawnshop of Nierman and asked him to get an officer. An officer was called, who took defendant in custody. He was kept in custody and subsequently was indicted, tried and convicted. He testified he had never heard of Miss Leegson; that he never called her on the telephone; that he was in no way connected with her murder and knew nothing of it until he read of it in the paper.

Of the seven witnesses who testified defendant was in Gary October 4 and 5 four were men and three women. If their testimony was true defendant could not have committed the crime. By way of rebuttal one woman testified for the State that she roomed in a house kept by Mrs. Saunders; that defendant occupied a room just back of hers, with a door between them; that defendant did not stay in his room the night of October 3 and that he was away three or four or five days; that Mrs. Saunders wondered if he was coming back, and had nearly rented his room to another man before he returned. The stenographer who took down the statements of Collins, the saloon-keeper, to Capt. Halpin on January 14, 1914, testified Collins then said he could not say where defendant was October 3, 4 or 5; that he left town four or five days somewhere between the first and the tenth. A police officer of Gary testified he remembered October 4; that he was around electioneering on that day and went to Collins' place four or five times and was down in the basement; that he was there both forenoon, afternoon and evening and did not see defendant either in the saloon or in the basement. The last time the witness visited the saloon and basement was about eleven o'clock P. M. Alma Smart, one of defendant's witnesses, testified positively to defendant's being in Gary October 4 and 5, giv-

281 —32

ing the hours, places and circumstances under which she saw him. She roomed at the home of Oscar Middleton, and testified it was there she saw him at some occasions during those dates. In rebuttal Oscar Middleton testified he kept roomers and that Alma Smart was one of his roomers; that about eleven o'clock in the evening of October 1 defendant came and asked for Alma Smart; that witness showed him to her room and did not again see him until seven or eight o'clock in the evening of October 6; that he did not see him the 2d, 3d, 4th or 5th; that witness stayed at home that week, and was at home all day Sunday, the 5th, but did not see defendant at any time that day. Alma Smart had testified that defendant was in her room part of the day Sunday, had breakfast there at ten o'clock and went to Chicago the next day, which would be October 6, returning at night.

It is evident the jury did not believe the witnesses who testified that defendant was in Gary on October 4 and 5, and a reviewing court cannot say from this record that they were of so reliable a character that the jury would not be warranted in disbelieving them. All of them were friends and associates of defendant and some of them were contradicted by other witnesses. The testimony of the three witnesses for the State who identified defendant as being the man they saw in the vicinity of the murder October 4 and the morning afterwards, when he came into the pawnshop to pawn the watch, was positive and unequivocal. The motorman on whose car the colored man rode the morning of the 5th testified defendant looked exactly like that man and resembled him very much. If these witnesses were worthy of belief defendant was not in Gary the 4th and 5th of October but was in the vicinity of the murder, and one of them testified that he was with a white woman and another testified that it was he who pawned the murdered woman's watch. If the testimony of these witnesses was true it warranted the verdict finding defendant guilty, and

the jury must have believed it was true or defendant would not have been convicted. We have frequently said that it is the province of the jury to judge of the credibility of the witnesses and that a verdict will not be set aside merely because the evidence is conflicting. Reviewing courts can not usurp the functions of a jury by substituting their judgment for that of a jury in passing on the weight and credibility of conflicting testimony. *People* v. *McCann,* 247 Ill. 130; *People* v. *Hohimer,* 271 id. 515.

On cross-examination Alma Smart, a witness for defendant, was asked by counsel for the State if she had kept a house of ill-fame at Gary and whether she had been arrested and tried on that charge. Witness answered she had not kept such a house; that she had been arrested but was not found guilty or fined. Objections made by defendant to the questions which elicited those answers were overruled, and these rulings of the court are assigned as erroneous. The evident purpose of the questions asked the witness was to discredit her testimony by her answers. It is permissible to inquire of a witness as to his or her occupation. If a witness is engaged in an unlawful and disreputable occupation, in justice and fairness he should not be permitted to appear before the jury as a person of high character who is engaged in a lawful and respectable occupation. (*People* v. *White,* 251 Ill. 67.) But the court should not have permitted the witness to be asked whether she had been arrested and tried on the charge of keeping a house of ill-fame. She answered that she had been arrested but was not found guilty or fined, and no attempt was made to contradict her statement. In view of her answers we cannot see how defendant was prejudiced by the error, and upon a consideration of the whole record we are of opinion a reversal of the judgment would not be justified on account of that error. *People* v. *Murphy,* 276 Ill. 304.

The judgment of the criminal court is affirmed.

*Judgment affirmed.*