THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
GREGORY HINES *et al.*, Defendants-Appellants.

First District (4th Division)    Nos. 78-1916, 78-1921 cons.

Opinion filed March 26, 1981.

Ralph Ruebner and Steven Clark, both of State Appellate Defender's Office, of Chicago, for appellant Gregory Hines.

Lonny Ben Ogus, of Chicago, for appellant Floyd Scott.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Pamela L. Gray, and John M. Hynes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE LINN delivered the opinion of the court:

At the conclusion of a jury trial in the circuit court of Cook County, defendants, Gregory Hines and Floyd Scott, were found guilty of rape (Ill. Rev. Stat. 1979, ch. 38, par. 11—1) and armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2). Hines was sentenced to a prison term of 8 to 15 years; Scott to a term of 10 to 15 years. Defendants brought separate appeals which have been consolidated here.

On appeal, Hines raises two issues: (1) whether his right to confront the witnesses against him was violated by the admission of a hearsay statement of one of the victims; and (2) whether his right to confront the witnesses against him was violated by the trial court's refusal to allow him to cross-examine a State's witness to show the witness was a prostitute. Scott also raises the above issues and contends further: (1) his motion to suppress his arrest was improperly denied; (2) he was not proven guilty beyond a reasonable doubt; and (3) he was denied the effective assistance of counsel.

We affirm the convictions of both defendants.

### State's Evidence

The incident occurred at 2:30 a.m., May 30, 1977, in a high crime area along the 400 block of Central Avenue in Chicago just north of the intersection of Central Avenue and Lake Street. Central runs north and south, Lake east and west. The victims were a husband and wife. The wife testified at trial but the husband was not present to testify.

The wife testified she and her husband were walking along Central Avenue when they passed defendant Hines who was walking in the other direction. Just after passing Hines, the wife saw him put a gun up to her husband's back and say, "This is a stickup." Hines then forced them to walk down an alley running perpendicular to Central Avenue. Along the way, another man joined Hines and ordered them into another alley that ran parallel to Central Avenue. The wife was unable at this time to see the face of the other man because he stayed behind her out of her sight. The victims were forced to face a wall and then the two assailants proceeded to remove their jewelry and money. Among the items of jewelry taken were a watch and ring from the husband and two bracelets and a ring from the wife.

After taking the victim's valuables, the assailants ordered the victims to get into a hole that had been dug in the alley by a construction crew. At this point, the wife saw the other assailant for a brief moment but could only say that he was shorter than Hines and had "slicked-back" hair. (This description fit defendant Scott but, of course, is an insufficient identification, in and of itself, to prove Scott's involvement.) The victims were ordered to remove all their clothes, which they did. While Hines held the gun on the victims, the other assailant jumped into the hole and raped the wife. Though there were overhead lamps partially lighting the area, the wife did not see the face of the other assailant at this time because she kept her eyes closed during the rape.

While the above was going on, Debra Lowe and a woman friend were walking along Central Avenue. Lowe looked down a walkway separating two buildings on Central Avenue and saw Hines approximately 30 feet away in the alley holding the gun over the victims. Lowe summoned a nearby police car and told the two officers in the car what she had just seen. The police sped off and headed for the north entrance to the alley. As they did so, Lowe looked down the walkway again and saw defendant Scott come out of the hole. He ran south down the alley and Lowe saw him again as he was running across a parking lot next to a 24-hour restaurant called "Whoopies" located at the intersection of Central Avenue and Lake Street. Lowe then lost sight of him.

The two police officers entered the alley from the north and immediately encountered Hines heading towards them. They stopped the car, got out, and forced Hines to stop. Just then, the police officers saw the nude victims hurrying towards them. The husband immediately said that he had been robbed and his wife raped and that Hines was one of the assailants. The wife also said that Hines was one of the assailants. Hines was placed under arrest. The gun used in the crime was later found in the alley.

At the time Hines was being arrested, another police car with two

officers, Robert Lawler and Jeffrey Zitzka, was proceeding along Lake Street near the intersection of Lake and Central. The driver, Lawler, suddenly saw a man in a green jacket running across a parking lot towards the intersection of Lake and Central. The man darted in front of the police car and Lawler slowed down to let him pass. Lawler saw the man's face at this time and recognized him as defendant Scott. Just after Scott passed by, Lawler said to his partner, "What was that?" Zitzka, who had not been looking, asked Lawler what he meant. Lawler said he had just seen a man run in front of the car. Lawler proceeded along Lake Street but looked in his rear-view mirror and saw Scott approach the L-station at Lake and Central. He saw Scott turn the corner behind a building and then look back around the corner at the police car. Seconds later, a dispatch came over the radio saying that a robbery had just occurred in the 400 block of Central and one assailant was in custody. Lawler made a turn down another street and quickly returned to where he had last seen Scott. Lawler and Zitzka got out of the car and went in separate directions looking for Scott. Zitzka found Scott at the overhead L-station at Central and Lake hiding behind a wind screen. Scott was the only person at the station. Zitzka drew his weapon, announced his presence, and ordered Scott to come out from behind the wind screen. Scott did as ordered and Zitzka then put his weapon away and led Scott back to the police car where Lawler met them and identified Scott as the man he had seen run in front of the car. Zitzka then searched Scott for weapons but found no weapons. Scott was then placed in the police car and driven a half block to where Lawler and Zitzka saw a police officer standing with Lowe and her friend. After the three officers had a brief conversation, Lowe was asked to look inside the police car, and upon doing so she identified Scott as one of the men she had seen committing the robbery. Scott was formally placed under arrest.

Later that morning, at the police station, both Hines and Scott were searched. The watch, two rings, and one of the bracelets taken from the victims were recovered from Hines. The other bracelet was recovered from Scott. Subsequently, a lineup was held. The wife identified Hines in the lineup but could not pick Scott out of the lineup.

Medical evidence was introduced at trial to show that the wife had been raped. Scott's underwear was introduced and it was shown to have semen stains though it could not be proven that the stains were the result of the particular act of intercourse involved in the rape.

### Defendants' Evidence

Defendant Hines testified in his own behalf. He claimed he was never identified by either of the victims when he was stopped in the alley by the police. He also claimed that at the time of the incident he had just

gone into the alley to urinate and upon doing so he discovered the victims' valuables on the ground. He had just picked them up when the police arrived.

Defendant Scott also testified in his own behalf. He claimed that in the early evening of May 29, 1977, he had been with a woman friend at her apartment and they had engaged in sexual intercourse. Afterwards, at approximately 8 p.m. on May 29, he met his sister and a male friend of his sister. They spent the evening in a tavern located a few blocks from the scene of the incident. At approximately 2 a.m., May 30, the three of them went to the L-station at Lake and Central. While there, Scott's sister and her friend decided they wanted to eat something. They left and went to "Whoopies" restaurant and promised to bring Scott a sandwich when they returned. Shortly thereafter, Scott was arrested.

The woman friend with whom Scott had allegedly had sexual intercourse, Scott's sister, and his sister's friend, all testified on behalf of Scott and verified his testimony.

Following presentation of all evidence, the jury found both defendants guilty of rape and armed robbery.

OPINION

I

The first two issues raised here concern the defendants' constitutional right to be confronted with the witnesses against them. (U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8.) At trial, the hearsay statement of the husband-victim identifying Hines as one of the assailants was admitted under the spontaneous declaration exception to the hearsay rule. Both defendants allege their constitutional rights were violated by the admission of this evidence. At trial, Debra Lowe was allowed to testify to what she had seen and said on the morning of the incident. Pursuant to a State's motion in limine, defendants were not allowed to question Lowe as to her occupation which, during the hearing on the motion in limine, she readily admitted was prostitution. Both defendants allege this restriction on the scope of their cross-examination violated their constitutional rights.

We consider first the admission of the hearsay declaration. We initially note that though both defendants raise the admission of this evidence as error, the identification made by the husband went only to defendant Hines and we believe defendant Scott cannot claim any prejudicial error involving this hearsay statement. We thus consider the issue only as it relates to Hines.

Defendant Hines admits that the statement was a spontaneous declaration as that exception to the hearsay rule has been defined. (See *People v. McNeal* (1980), 88 Ill. App. 3d 20, 410 N.E.2d 480.) However, he contends that the State should have been required to produce the husband

at trial so that defendant Hines could have tested the husband's ability to perceive at the time of the incident, and he concludes the State's failure to produce the witness at trial violated his right of confrontation.

The rules of evidence of this State have long allowed the admission into evidence of a spontaneous declaration against a defendant in a criminal trial regardless of whether the State produces the declarant as a witness at trial. However, a recent United States Supreme Court decision (*Ohio v. Roberts* (1980), ___ U.S. ___, 65 L. Ed. 2d 597, 100 S. Ct. 2531) has cast a cloud of doubt over the continuing validity of this rule. In *Roberts*, the court set out two general rules for the admissibility of all hearsay declarations[1] used against a defendant in a criminal trial, which rules the court deemed necessary to comply with the purposes of the confrontation clause while likewise protecting a State's strong interest in effective law enforcement, an interest that may sometimes justify dispensing with defendant's right to confront the witnesses against him at trial. The two rules are: (1) in the usual case, hearsay is admissible against the accused only if the State produces the declarant so he can be subjected to cross-examination at trial, or, if not produced, the State has made an initial showing that the declarant is unavailable; and (2) if the declarant is not available for cross-examination at trial, the hearsay declaration is admissible only if it bears adequate "indicia of reliability."

As to the second rule, the court said that adequate "indicia of reliability" can be assumed if the declaration falls within a firmly rooted hearsay exception. A spontaneous declaration obviously meets this requirement. As to the first rule, the court, in a footnote, said that a showing of unavailability is not always required. (___ U.S. ___, ___ n.7, 65 L. Ed. 2d 597, 607 n.7, 100, S. Ct. 2531, 2538 n.7.) As an example of when such a showing is not required, the court cited *Dutton v. Evans* (1970), 400 U.S. 74, 27 L. Ed. 2d 213, 91 S. Ct. 210, in which the admission of a hearsay declaration of a seemingly available witness who did not testify at trial was held proper under the confrontation clause because the possible utility of cross-examination was so remote that the production of the witness would not have resulted in changing the importance of the statement or the effect it had on the jury. One should note that the hearsay declaration in *Dutton*, a statement by a co-conspirator blaming defendant for the coconspirator's predicament of being in jail, was found to be of "peripheral" significance to the case, merely cumulative of other overwhelming evidence, contained no express assertion of fact, and carried on its face a warning to the jury that it was not to be given undue weight.

---

[1] By "hearsay declaration" we mean only those out-of-court statements testified to by a witness at trial which are used to prove the truth of the matter asserted. We are not referring to statements used only for other purposes, such as to prove the testifying witness' knowledge of the statement, which statements are not legally classified as "hearsay."

In the present case, the husband was not produced as a witness at trial, nor did the State show unavailability. However, the trial of this case occurred prior to the *Roberts* decision, and we believe the necessity for showing unavailability was intended to have future effect only. The court indicated that the rules it was setting out represented another gradual change in response to new experiences and changing conditions, and the rules were being offered as a "general approach" to the problem of conflict between admissible hearsay and the confrontation clause. (____ U.S. ___, ___, 65 L. Ed. 2d 597, 607, 100 S. Ct. 2531, 2538.) Because of this, we believe the Court intended that the rule of showing unavailability was to be for prospective application only.

■■ Accordingly, we hold that the failure to produce the husband or show his unavailability was not required in this case. Since Hines admits the declaration was a spontaneous declaration, his admission concedes that the statement bore adequate "indicia of reliability," and consequently its admission into evidence did not violate his constitutional right of confrontation.

## II

■■ The second issue involving defendants' right of confrontation involves the alleged improper limitation by the court on the scope of their cross-examination of Debra Lowe, a witness who was present and testifying at trial. It is clear that under our law the granting of the State's motion in limine to preclude questioning into the witness' occupation, prostitution, was improper for two reasons. First, it has many times been held that it is proper to cross-examine a witness to bring out the fact that the witness engages in an unlawful and disreputable occupation as a matter affecting that witness' general credibility. (*People v. Crump* (1955), 5 Ill. 2d 251, 125 N.E.2d 615; *People v. Winchester* (1933), 352 Ill. 237, 185 N.E. 580; *People v. Bond* (1917), 281 Ill. 490, 118 N.E. 14.) Second, in the present case there are particular facts that defendants wished to bring out concerning the witness that also might have shown the witness' motive for testifying favorably to the State. If the defendants were allowed to establish that the witness was a prostitute, they were then prepared to show that many of the police officers who testified at trial knew the witness was and had been a prostitute for a long time, and these police officers frequently patrolled the area in which the witness solicited patrons. From this, defendants wanted to argue in closing arguments that the witness, if she gave favorable testimony for the State, might have believed the testifying officers would not arrest her in the future. Thus, the defendants wanted to bring out that the witness was a prostitute, not only as an attack on her general credibility, but also as a basis for further inquiry to attack her motive for testifying favorably to the State.

■■ Though it was error to grant the State's motion in limine, our inquiry

into whether defendants' right of confrontation was violated begins rather than ends with this finding. The United States Supreme Court has held " 'that a primary interest secured by [the Confrontation Clause] is the right of cross-examination.' " (*Ohio v. Roberts* (1980), ___ U.S. ___, ___, 65 L. Ed. 2d 597, 606, 100 S. Ct. 2531, 2537; *Davis v. Alaska* (1974), 415 U.S. 308, 315, 39 L. Ed. 2d 347, 353, 94 S. Ct. 1105, 1110; *Douglas v. Alabama* (1965), 380 U.S. 415, 418, 13 L. Ed. 2d 934, 937, 85 S. Ct. 1074, 1076.) However, when determining whether a denial of cross-examination violates the defendant's right of confrontation, we should look not to what defendant has been prohibited from doing but to what he has been allowed to do. The issue under the confrontation clause is whether the jury has been made aware of adequate factors to determine whether the witness is worthy of belief (see *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105; *Thomas v. Cardwell* (9th Cir. 1980), 626 F. 2d 1375), not whether any particular limitation has been placed upon defendant's ability to cross-examine a witness or whether the jury has knowledge of any specific fact. Thus, if it appears from the entire record that the jury has been made aware of adequate factors concerning relevant areas of impeachment of a witness, no constitutional question arises merely because defendant has been prohibited on cross-examination from pursuing other areas of inquiry. See *United States v. Vasilios* (5th Cir. 1979), 598 F.2d 387, *cert. denied* (1979), 444 U.S. 932, 62 L. Ed. 2d 380, 100 S. Ct. 456.

In the present case, defendants were initially prohibited from cross-examining Lowe, an important witness, concerning a subject affecting her credibility. Nevertheless, our examination of the record indicates that no constitutional violation occurred. On cross-examination of Lowe and the police officers who testified, defendants were able, without objection, to bring out significant facts affecting Lowe's credibility. For example, they were able to discredit, somewhat, Lowe's ability to accurately perceive what she claimed she had seen. They brought out that the alley in which the crime occurred, though lighted, was not sufficiently lighted to assure definite identification of defendants. Also brought out was a significant discrepancy in the distance between Lowe and the defendants when she saw them. Though the State claimed she was only 30 feet away, she admitted at one point that she was 100 feet away. She also admitted that she saw Scott for only a few seconds.

More important, the defendants were able to bring out an admission that the police officers knew Lowe well because they patrolled the area frequently and she was often seen walking on the sidewalk. Also, on cross-examination of Lowe, she admitted she often "walked around" the area, a high crime district, at 2:30 in the morning, and she often "stood around" on a nearby street corner during the late hours of the night. In

closing arguments, defense counsel frequently referred to Lowe as a "lady of the early morning" who knew all of the police officers well and who thus had an obvious reason to testify against defendants. Though the State objected to many of these references, the court allowed defense counsel to make most of them over the State's objection. In fact, the implications made by defense counsel were so obvious that in the State's rebuttal argument, the State practically conceded Lowe's occupation as a fact and attempted to argue her credibility despite her occupation.

■■ Thus, we believe that the jury was made aware of adequate factors to determine whether Lowe was worthy of belief. Therefore, we hold that the error committed by the trial court in granting the State's motion in limine did not amount to a violation of defendants' constitutional right to be confronted with the witnesses against them. Though the granting of the motion in limine is considered error under the rules that our courts follow in determining whether there has been an improper limit placed upon the scope of cross-examination, we do not believe the error resulted in any manifest prejudice to the accused because defendants were able to circumvent and obviate the impact of the motion in limine by using cross-examination to effectively inform the jury that the witness was, in all likelihood, a prostitute with a possible motive for testifying favorably to the State.

Accordingly, we hold that defendants' contention is without merit.

### III

The third issue we consider is whether defendant Scott's arrest should have been held invalid. Specifically, defendant Scott contends that he was subjected to an unreasonable seizure when he was taken into custody at the L-platform and transported to the scene of the crime. The parties agree that there was not probable cause for this seizure. The parties also agree that probable cause for arrest arose when Scott was identified at the scene of the crime by Lowe. The dispute concerns whether the police had sufficient justification to take Scott into custody and transport him to the scene of the crime.

In a line of cases, the United States Supreme Court has held that a warrantless, temporary, investigatory detention of a suspect without actual arrest may be justified in certain cases based on less than probable cause. (*E.g., United States v. Cortez* (1981), ___ U.S. ___, 66 L. Ed. 2d 621, 101 S. Ct. 690; *Adams v. Williams* (1972), 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921; *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) Illinois has codified this legal principle in section 107—14 of the Criminal Code (Ill. Rev. Stat. 1979, ch. 38, par. 107—14), which reads:

"A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable

period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit or has committed an offense \* \* \*, and may demand the name and address of the person and an explanation of his actions. Such detention and temporary questioning will be conducted in the vicinity of where the person was stopped."

■■ To determine whether such an investigatory detention is reasonable based on less than probable cause, a court must view all of the circumstances surrounding the investigatory stop and detention from the eyes of a trained police officer and determine whether the detaining officer had a particularized and objective basis for suspecting the person stopped of criminal activity. *United States v. Cortez* (1981), ___ U.S. ___, 66 L. Ed. 2d 621, 101 S. Ct. 690; see *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537, *cert. denied* (1978), 435 U.S. 975, 56 L. Ed. 2d 69, 98 S. Ct. 1624.

■■ In the present case, we believe that, considering all the circumstances, the officers had a particularized and objective basis for suspecting Scott of criminal activity. Among the circumstances leading to this conclusion are the following: (1) the police were patrolling in a high crime district at 2:30 in the morning; (2) one of the officers saw Scott run across a parking lot, run in front of the patrol car, and then stare back at the patrol car from around the corner of a building; and (3) seconds after this, the police received a call that a robbery had just occurred in the immediate vicinity. Because of these circumstances, we believe that from the eyes of a trained police officer, the detaining officers had a particularized and objective basis to suspect Scott of criminal activity. Thus, we believe it was reasonable to temporarily detain Scott for investigation. We also believe, that under the circumstances in this case, it was reasonable to transport Scott the one-half block to the scene of the crime to ascertain whether he had been involved. See *People v. Beacham* (1980), 87 Ill. App. 3d 457, 410 N.E.2d 87.

Accordingly, we hold that the seizure and subsequent arrest of defendant were valid and Scott's motion to suppress his arrest was properly denied.

## IV

The fourth issue raised is whether defendant Scott was proven guilty beyond a reasonable doubt. Defendant Scott was positively identified as one of the perpetrators of the crime by witness Lowe. Defendant was seen running from the vicinity of the crime by a police officer. Defendant was found to be in possession of one of the bracelets taken in the robbery. Though the wife-victim could not identify Scott, this was explainable because she kept her eyes closed during the rape and never had a clear

look at Scott in lighted conditions. Additionally, defendant's underwear was found to contain semen stains. Though defendant Scott presented alibi witnesses, it was for the jury to determine who was to be believed. (See *People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) From the evidence presented, we believe defendant was proven guilty beyond a reasonable doubt.

## V

The final issue raised by defendant Scott is that he was denied the effective assistance of counsel. Actually, two subissues are raised here. Defendant first points to a few minor points concerning his counsel at trial that he claims prove he was denied effective assistance of counsel at trial. We find that we need consider this subissue only in passing because our examination of the record indicates that Scott's counsel was more than adequate.

The second subissue presents a different argument. Defendant's appellate counsel, who is different from his trial counsel, claims that he cannot effectively assist Scott on appeal. Scott's counsel at trial waived making a record of the *voir dire* of the jury, except for the opening portion of *voir dire* and specific points concerning some of the jurors for which a record was made. Scott's appellate counsel alleges that trial counsel's failure to insist on a record of the complete *voir dire* of the jury has denied Scott on appeal the opportunity to raise issues concerning the *voir dire.* Thus, appellate counsel contends he is ineffective because he has no record of the *voir dire* to examine for possible errors.

Apparently, the specific issue raised here is that when trial counsel knows that he will not represent the defendant on appeal, a record of the *voir dire* must be made in all cases and it cannot be waived, and the failure to make such a record is plain error demanding a reversal as a matter of law. In the present case, it is admitted that trial counsel, a public defender, knew he would not represent Scott on appeal. However, we do not believe that this fact automatically requires that a record of the *voir dire* must be made though such a record is waived by defendant at trial.

Defendant points to *Hardy v. United States* (1964), 375 U.S. 277, 11 L. Ed. 2d 331, 84 S. Ct. 424, and Federal cases following it, as setting out a requirement that all trial proceedings must be recorded and it is reversible error not to have done so when new counsel represents a defendant on appeal. However, *Hardy* and its progeny dealt only with the interpretation and effect of a Federal statute which dictates that such a record must be made. (See 28 U.S.C. §753(b) (1976).) As far as constitutional requirements of due process are concerned, the Supreme Court has only held that the accused must be provided on appeal with a record of sufficient complete-ness affording adequate and effective appellate review. (*Mayer v. City of*

*Chicago* (1971), 404 U.S. 189, 30 L. Ed. 2d 372, 92 S. Ct. 410.) The Supreme Court has never held that a defendant in a State criminal proceeding must have a complete record made of all proceedings regardless of whether defendant's counsel allows for certain portions of the proceedings to be left unrecorded.

■■ In this case, defendant was not prevented from having the *voir dire* made of record. His counsel at trial chose to allow the absence of such a record. If counsel at trial believed that important issues were being raised during the *voir dire*, he could have insisted, as he did on one occasion, to have those parts of *voir dire* made of record. What counsel on appeal is arguing is that we should assume that counsel at trial was incompetent and thus could not recognize appealable issues if they arose in the *voir dire*. From this, we are asked to conclude that the absence of such a record constitutes plain error. This we refuse to do. Therefore, we necessarily hold that defendant's contention that he is being denied effective assistance of counsel on appeal merely because of the absence of a record of the *voir dire* is without merit.

Accordingly, for the reasons set forth, we affirm the convictions of both defendants, Hines and Scott.

Affirmed.

ROMITI, P. J., and JOHNSON, J., concur.