## Henry T. Digby

*v.*

## The People of the State of Illinois.

*Filed at Mt. Vernon January 22, 1885.*

Evidence—*dying declarations.* Upon the trial of a person on the charge of murder, it appeared that the deceased, some days before his death from the wound he had received, made a statement to the effect that the defendant shot him. The preliminary proof to the court showed that at the time of making the statement the deceased had not been informed by his physician or any one else that his wound was mortal, though he said at the time he would not live three days. It further appeared that he made no preparation of any kind in view of death, often used profane language, and spoke about being able to resume business and of getting married in a few days: *Held,* that the statement of the deceased was not admissible as a dying declaration, it not appearing it was made in view of impending death, and under the sanction of a moral sense of certain and just retribution.

· Writ of Error to the Circuit Court of Hamilton county; the Hon. M. C. Crawford, Judge, presiding.

Mr. T. B. Stelle, for the plaintiff in error:

As to the admissibility of dying declarations, in general, see *Starkey* v. *People*, 17 Ill. 17.

It is not the province of the court, in a criminal case, to express an opinion upon the facts, whether orally or during the progress of the trial, or in the form of instructions. *Weyrich* v. *People*, 89 Ill. 90; *Bond* v. *People*, 39 id. 26.

The court, by its instructions, swept away the issues, and told the jury "that the dying declarations of the deceased * * * are proper for your consideration, and in passing upon their weight or value, you have a right to take into consideration all the facts and circumstances surrounding the deceased, so far as presented by the evidence."

Mr. Justice Craig delivered the opinion of the Court:

This was an indictment for murder. It was claimed on behalf of the People that in the night of October 18, 1878, Henry T. Digby, the plaintiff in error, attempted to rob one John Sinclair, who was sleeping in a room at the house of John Digby, and that while engaged in the effort to commit the robbery, plaintiff in error shot and mortally wounded Sinclair, who, in a few days thereafter, from the effects of the wound received, died. At the September term, 1879, of the circuit court of Hamilton county, the plaintiff in error was tried, and found guilty, and his term of imprisonment was fixed, in the penitentiary, at fourteen years, by the jury. The court overruled a motion for a new trial, and rendered judgment on the verdict. To reverse the judgment, this writ of error was sued out, September 30, 1884.

Upon an examination of the evidence introduced by the People to establish the guilt of the defendant, we find no evidence in the record which can be regarded as sufficient to sustain the verdict of the jury, aside from the declarations of Sinclair, made in the presence and hearing of Dr. Bullard.

It therefore becomes an important question· whether those declarations were proper and legal evidence for the consideration of the jury in passing upon the guilt or innocence of the defendant.

Dr. Bullard, who was called as a witness for the People, over the objection of the defendant, testified to the declarations of the deceased, as follows : "I saw deceased twice after he was shot. On Saturday afternoon, after he was shot, I saw him. He knew me. I asked him if he had any idea who shot him, and he said, 'The man who shot me wears a pair of shop-made boots.' I said I hoped it was not a fatal shot, and tried to encourage him. He made no reply. Again, on Monday, about two or three o'clock in the afternoon, I saw deceased. He knew me. He said he felt mighty bad. I told him I hoped it was not a fatal shot, and that I hoped he would get well. He said, 'No; I'll not live three days.' I asked him if he knew who shot him. He said he did,—that it was ·Henry Digby. He gave no reason for thinking it was Henry Digby. He spoke fluently."

As a general rule, hearsay evidence is not admissible, but an exception to the general rule is found in case of dying declarations, on the trial of a defendant on an indictment of this character. Before the court admitted the declarations, evidence was heard by the court for the purpose of ascertaining whether such declarations could be regarded as the dying declarations of Sinclair. From this evidence, it nowhere appears that Sinclair had ever been advised by his physicians, or by any other person, that his wound was mortal, and that he could not recover. Nor does the evidence, when fairly considered, establish the fact that Sinclair believed he would not recover. It is true that some of the witnesses state that he said he could not get well, but others who were with him constantly, testify the other way. Richard Sinclair, who was called on behalf of the People, testified : "I was with him nearly all the time. I never heard him express himself about

living or dying. We were in business together. He never talked about any disposition of his property or business." Blades, who testified for the People, said Sinclair "swore about being waked up. He never said anything about business, religion or dying." Elizabeth Merrill testified: "I was with deceased every day, after he was shot, until he died. He was anxious about his medicines, and wanted to take them regularly. He said several times he wished he knew the God damned man that shot him. He asked Eliza when she and her mother were going to town to get her things. He told me, on Tuesday night, that he would be able for he and Eliza to get married by next Sunday. He said he was better. He said, Tuesday night, he would give $100 or $50 to know the damned man who shot him. He always told me he was getting better, until Tuesday night." Sarah Downing, called for defendant, testified: "I saw deceased on Tuesday before he died. I asked him how he was. He said if he kept on getting better he would start the factory on next Monday." Eliza Digby, also for defendant, testified: "I am the sister of defendant, and was with deceased nearly all the time, after he was shot. Deceased and I were engaged to be married, and he wanted to know when I was going to town to get my clothes to be married in. He told me several times he was better. I heard him swear. He said, 'God damn it.' I waited on him and nursed him." On cross-examination this witness stated "deceased said he thought he would get up by next Sunday." Several witnesses also testified to repeated acts of swearing by Sinclair during his illness, but a statement of the language used will serve no useful purpose here.

When due weight is given to all the evidence introduced before the court, does the testimony of Dr. Bullard fall within what is known in law as dying declarations? It is said in 1 Greanleaf on Evidence, sec. 156: "The general principle on which this species of evidence is admitted was stated by Lord Chief Baron EYRE to be this: That they are declara-

tions made in extremity, when the party is at the point of death, and when every hope of this world is gone; when every motive to falsehood is silenced, and the mind is induced, by the most powerful considerations, to speak the truth. A situation so solemn and so awful is considered by the law as creating an obligation equal to that which is imposed by a positive oath in a court of justice." In *Starkey* v. *People*, 17 Ill. 17, this court, in considering this class of evidence, said: "Dying declarations are therefore such as are made by the party, relating to the facts of the injury of which he afterwards dies, under the fixed belief and moral conviction that his death is impending, and certain to follow almost immediately, without opportunity for repentance, and in the absence of all hope of avoidance,—when he has despaired of life, and looks to death as inevitable and at hand."

Were the declarations in question made in extremity? Was deceased at the point of death, and all hope of life gone, and death expected to follow at once? The record discloses no such case. It is true that the deceased stated that he would not live three days; but this, when considered in connection with the other evidence on the subject, is not enough to bring the evidence within the rule laid down in the authorities heretofore cited. Again, the physicians who were attending the deceased had never informed him that his wound was a dangerous one, and likely to produce death, nor had his friends so advised him. Nor had the deceased made any preparation for death, spiritually or otherwise, as he probably would have done had he supposed death was near at hand. He, as appears, was in business, and had property, but he made no effort whatever to settle his business affairs or make disposition of his property, as he probably would have done had he anticipated that his life was about to terminate. On the other hand, he talked of his business as a man would who expected soon to be able to take charge of his affairs again. In view of these facts, which were before the court when the

evidence was offered, we are of opinion that it can not be regarded as the dying declarations of the deceased.

It will be remembered that evidence known as dying declarations is hearsay in its character. The accused has not the right to meet the witness who accuses him, face to face. He is deprived of the right of cross-examination,—one of the greatest tests of truth in the trial of a crime. The evidence is not given under the sanctity of an oath. But while these safeguards, which are thrown around ordinary evidence for the purpose of preventing falsehood, can not be applied to dying declarations, still there is one element,—one check,—which can not be dispensed with, and that is, that the declarations, as declared in *Starkey* v. *People*, must be made in view of impending death, and under the sanction of a moral sense of certain and just retribution. The declarations read in evidence were not made under such circumstances, and we do not think they were admissible in evidence against the defendant.

The judgment of the circuit court will be reversed, and the cause remanded.

*Judgment reversed.*