THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LAWRENCE WHITE, Plaintiff in Error.

*Opinion filed June 20, 1911—Rehearing denied October 10, 1911.*

1. CRIMINAL LAW—*where two acts form one transaction proof of both is proper.* The evidence should be confined to the issue being tried, but where there is a logical and natural connection between two acts, or where they form but one transaction, proof of both is proper.

2. SAME—*when proof of occurrences before deceased came on the scene is proper.* In a prosecution for the shooting of a restaurant keeper, where the plea is self-defense, it is proper to show, as bearing upon the question of who was the aggressor, that before the restaurant keeper came into the room the accused had assaulted a waiter and chased him from the room and had thrown dishes and crockery upon the floor.

3. SAME—*it is proper to cross-examine a witness as to his occupation.* It is proper to cross-examine a witness as to his occupation and other matters which will enable the jury to determine what weight ought to be given to his testimony.

4. SAME—*what does not preclude legitimate cross-examination.* Where a witness for the accused in a murder trial testifies that he is a bar-tender and has tended bar for the accused for eighteen months, it is not error to allow the prosecution to show, on cross-examination, that for fifteen years the witness had spent more time in working in gambling houses than in tending bar.

5. SAME—*what is not within rule against proving other and distinct crimes.* The rule that proof of other offenses not connected with the charge on which the defendant is being tried can not be made does not go to the extent of precluding legitimate cross-examination of a witness for the accused because an inference unfavorable to the accused may arise, nor of compelling the prosecution to permit the witness to appear before the jury as a man of high character when he is, in fact, disreputable and his chief occupation that of a law-breaker.

6. SAME—*court determines whether statement is admissible as a dying declaration.* The question whether a statement is made under such circumstances as render it admissible as a dying declaration is a question to be determined by the court from preliminary proof, and if it is admitted it is the province of the jury to determine what weight it shall have.

7. SAME—*when declaration is properly admitted as dying declaration.* A declaration made by a wounded man the day before his death, after being informed of and acquiescing in the opinion of his physician that death was certain and closely impending, is admissible as a dying declaration; and the fact that he sent for no minister is without significance, where there was no minister of his faith in the place.

8. SAME—*fact that a witness is assistant prosecuting attorney does not render him incompetent.* The fact that a witness who testifies to what occurred at the hospital at the time a dying declaration was made is an attorney who is assisting the prosecution goes only to his credibility and not to his competency.

9. SAME—*the fact that signature is witnessed does not render dying declaration inadmissible.* The fact that the names of two nurses are signed as witnesses to the signature on a dying declaration does not render the declaration inadmissible, where it plainly appears that the nurses merely witnessed the signature and it is not claimed or pretended that they knew anything about the truth of the statement.

10. SAME—*court cannot be asked to say that it has no opinion as to whether declaration is a dying declaration.* A statement can not be admitted as a dying declaration unless the court is satisfied that it is one, and hence it is proper to refuse an instruction holding that nothing said or done by the court should be taken to indicate that the court had any opinion as to whether the statement was the dying declaration of the deceased.

11. SAME—*when failure of instruction to refer to the evidence is not prejudicial.* That an instruction designed to inform the jury that they might find the accused guilty of manslaughter although they did not believe him guilty of murder fails to contain the requirement that the evidence must establish the facts beyond a reasonable doubt is not prejudicial to the accused, where numerous instructions are given stating that requirement in every form.

12. SAME—*when instruction as to weight to be given testimony of accused is correct.* An instruction directing the jury to give the testimony of the accused only such weight, if any, as they believe it is entitled to in view of all the facts and circumstances proved at the trial, is not incorrect because of the words "if any."

13. SAME—*what evidence not ground for motion for new trial.* A new trial should not be granted upon the strength of affidavits containing evidence which is merely cumulative and inconclusive.

14. SAME—*what does not overcome evidence that dying person was of sound mind.* Proof that the person who made a dying declaration was given a hypodermic injection of morphia that morn-

ing does not overcome the testimony of a number of witnesses that his mind was clear when he made the declaration.

15. The court reviews the evidence in this case at length, and holds that it sustains the verdict and judgment finding the accused guilty of manslaughter.

WRIT OF ERROR to the Circuit Court of LaSalle county; the Hon. SAMUEL C. STOUGH, Judge, presiding.

BROWNE & WILEY, and WALTER A. PANNECK, for plaintiff in error.

W. H. STEAD, Attorney General, and CHARLES S. CULLEN, State's Attorney, (HAROLD L. RICHOLSON, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

In the early morning of Monday, May 9, 1910, Lawrence White, plaintiff in error, assaulted one of the night waiters in the day and night restaurant of Harry Levy, in the city of Ottawa, and sugar bowls, salt cellars and other articles of crockery on the lunch counter were thrown to the floor and their contents scattered, either by being thrown at the waiter or knocked off. The waiter called Levy, who was sleeping in his residence on the second floor of an adjoining building, and he came down-stairs in answer to the call, partly dressed, with an undershirt, trousers and shoes on, and inquired the cause of the trouble. There was some talk about the affair between him and the plaintiff in error, and the plaintiff in error shot him, the bullet entering the lower part of the left breast. Levy died from the gunshot wound on Wednesday, May 11, at half-past ten o'clock in the forenoon, and the plaintiff in error was indicted for murder in the circuit court of LaSalle county. The only defense at the trial was self-defense, and the plaintiff in

error was found guilty of manslaughter and sentenced to confinement in the penitentiary.

The defendant objected to any evidence of what had occurred before Harry Levy entered the restaurant, on the ground that it was wholly unconnected with the killing of Levy and would tend to prejudice the jury against the defendant. The evidence in any case should be confined to the issue being tried, but where there is a logical and natural connection between two acts or where they form but one transaction, proof of both is proper. In this case the property of Levy had been thrown about the restaurant and some of it destroyed and his servant had been assaulted in his place of business. He came down when he was called, acting within his rights, to investigate the affair, and it was solely concerning that matter that there was any trouble between him and the defendant. In view of the defense made, it was especially necessary to know whether Levy was an aggressor or, making a proper inquiry in reference to a transaction in his own restaurant and in relation to his own property. The transactions were directly associated with each other by a perfectly natural connection, and the circumstances were such that the jury would not understand the situation or be able to decide the case intelligently without knowledge of what had occurred. The evidence was properly admitted.

There was no material controversy as to what happened between the defendant and the waiter. The defendant, who was a saloon-keeper, came from his saloon with his bar-tender, William Hallowell, at half-past five o'clock in the morning to the restaurant and they each ordered a ham and egg sandwich and a cup of coffee. The night men were still on duty, consisting of Loanke, the cook, and Reinert and Anderson, two waiters. Anderson waited on the defendant and his companion and they ate their lunch at the lunch counter. The defendant asked for a fork, and Reinert gave him one and afterward came around the end

of the counter and sat down on a stool next the defend-
ant, either voluntarily or at the invitation of the defendant.
It is uncertain just what was said between the defendant
and Reinert, but there was nothing said on either side
which would provoke an assault. Whatever it was, Rein-
ert jumped up and ran around back of the counter. The
defendant reached across the counter and got hold of him,
and, Reinert attempting to get away, they struggled along
the counter. There were three or four groups of dishes on
the counter, consisting of a sugar bowl, salt cellar, vinegar
cruet, and the like, and the testimony for the prosecution
was that whenever they reached a group of those things
the defendant would let go of Reinert with one hand and
throw the things at him. The defendant claimed that they
were pushed off the counter in the scuffle. At any rate,
those things and coffee cups were thrown upon the floor
and sugar and salt scattered about. When they got along
part way to the kitchen Reinert got loose from the defend-
ant and ran into the kitchen. The defendant then went
back to his overcoat, which was either hanging on a hook
at the wash-room door or lying over the cigar case, and
put it on. There was a revolver in one of the pockets, and
the cook testified that the defendant then came to the door
of the kitchen with the revolver, looking for Reinert, but
Reinert had gone up-stairs and called the proprietor, Levy,
who came down into the restaurant, back of the counter.
At this point the first substantial difference between the
witnesses began. The testimony for the prosecution was,
that Anderson was sweeping up sugar, broken saucers and
cups, and things that were behind the counter; that Levy
asked what the trouble was about, and the defendant said
that he was not to blame but the waiter was, and that the
waiter must be crazy; that Levy asked him to leave, and
White became angry, talking loudly and calling Levy a
"sheeny bastard," and said if he did not want to let Rein-
ert go he could go to hell; that Levy told White several

times to go out of the restaurant, and that the defendant then shot Levy and backed out of the restaurant door, and that Levy, after being shot, picked up a revolver from under the counter and shot at the defendant three times but did not hit him. The defendant and Hallowell testified that the defendant told Levy the difficulty was not his fault and sought to excuse himself; that Levy said to the defendant that if it was trouble he was looking for he would give him all he wanted of it; that Levy was pointing a revolver at defendant, and Hallowell said to Levy to put down the gun and he would get the defendant out, but the defendant, who was standing with his hands in his trousers pockets, said, "Let him shoot!" and Levy shot, and that after Levy shot, defendant took the revolver out of his overcoat and shot him, and Levy shot at the defendant twice afterward.

This is the substance of the testimony, and as the question to be determined by the jury was whether the defendant killed Levy in self-defense, it is manifest that the conclusion depended mainly upon the credibility of the witnesses. Hallowell and the defendant gave the testimony intended to establish the defense, and it is contended that the court erred in permitting the prosecution to cross-examine Hallowell as to his previous life and occupation, because it not only discredited him, but tended to show that the defendant was guilty of offenses against the law. On the direct examination Hallowell testified that neither he nor the defendant was drunk or intoxicated at the time, and on the cross-examination he was interrogated as to where and how he had spent the night and what he had drank. He said he had been up all night in the defendant's saloon and had drank probably three or four drinks of whisky. If this tended to prove that the defendant kept his saloon open all night it had already been proven without objection. Anderson had testified that a man came into the restaurant between one and two o'clock in the

morning and wanted a bottle of beer and half a pint of whisky; that Anderson called up the defendant and asked him if the saloon was open, and that the man gave Anderson a dollar and he went to the saloon and got two bottles of beer and a half-pint of whisky. In any view, the cross-examination was clearly proper upon the subject about which the witness testified on the direct examination. It is also proper to cross-examine a witness as to his occupation, and other matters which will enable the jury to determine what weight ought to be given to his testimony. This witness testified that he was a bar-tender and that he had tended bar for the defendant for eighteen months. The prosecution then showed, by further cross-examination, that he had put in more time in working for gambling houses in the last fifteen years than in tending bar or running a saloon; that he had been employed in the gambling houses of the city, operating gambling tools and devices; that the greater part of his business had been running gambling devices in gambling houses or playing what is called "house money" in poker games, which meant that the saloon or gambling place furnished the money played for; that his business as a gambler frequently obliged him to be up all night as often as once or twice a week, and that frequently on Saturday and Sunday nights he would be up all night. The court did not permit any question as to what work the witness did in the defendant's saloon or what took place there, and there was no attempt to make any such proof after the question was raised and the ruling made. It is argued that the cross-examination tended to show that the defendant ran a gambling house and was an offender against the law. But if there was any inference of that kind from what the witness said, it was a necessary and inevitable one in the exercise of the right that the prosecution had to bring before the jury the occupation and habits of life of the witness. The law does not permit proof of other offenses not connected with the

charge upon which the defendant is being tried, (*Addison* v. *People,* 193 Ill. 405; *Brom* v. *People,* 216 id. 148;) but the prosecution could not be hampered nor restrained in perfectly legitimate cross-examination because an inference unfavorable to defendant might arise. Surely the prosecution was not required to permit this witness to appear before the jury as a man of high character and worthy of confidence when he was disreputable and his chief occupation that of a law-breaker. The defendant was cross-examined as to his whereabouts during the night, and testified that he was in the saloon until 11:30 at night, when he went to Carr & Midnight's club room, where he drank a couple of "snits" of beer and returned to the saloon about 3:30 in the morning, where he remained with Hallowell until he went over to the restaurant. There was no attempt by his cross-examination to show any crime or any violation of law.

On Tuesday the doctor in attendance on Levy at the hospital called up the assistant State's attorney and told him that Levy had become much worse and he did not expect him to recover. The assistant State's attorney, with a stenographer and an attorney, went to the hospital, and the father of Levy was also there. The doctor was requested to inform Levy that he would not get well, but objected because it would rob Levy of the only comfort that he had. The father then told Levy that he would die and there was no hope, and Levy said that he knew it and expected it, and that he was ready to make a statement, and did so. His declaration, witnessed by two nurses in the hospital, was offered in evidence. It stated that Levy believed that he was about immediately to die from the effects of his wound and had no hope whatever of recovery, and made the statement as his dying declaration. The declaration was to the effect that the night man called him and he came down and the defendant started to do him up, and Levy took a gun and told the defendant to get out, but

Hallowell said to put the gun down and he would get him out; that he put the gun under the counter and defendant shot him; that he then picked up the gun and fired three shots; that the minute defendant shot he ducked and was going out when Levy shot. The declaration was objected to but was admitted on testimony heard in the absence of the jury, which was afterward read to the jury.

The question whether alleged dying declarations are made under such circumstances as to render them admissible in evidence is to be determined by the court upon the preliminary proof, and if admitted their credibility is exclusively for the jury, whose province it is to consider the circumstances and give them such credit as they may think they deserve. (*Starkey* v. *People,* 17 Ill. 17; *Hagenow* v. *People,* 188 id. 545; 21 Cyc. 986; 10 Am. & Eng. Ency. of Law,—2d ed.—287.) If the proof does not satisfy the court, beyond a reasonable doubt, that the declaration was made in extremity and was a dying declaration it should not be permitted to go to the jury. (*Digby* v. *People,* 113 Ill. 123; *Westbrook* v. *People,* 126 id. 81.) In our judgment the court was right. Levy was in actual danger of impending death, was suffering intense pain, had difficulty in speaking, was informed of the belief of the doctor that he could not recover, and, in fact, he died the next morning. The fact that he made some remark in answer to efforts of the nurses to cheer him up was not sufficient to show that he entertained a view different from that of the doctor or the statement in the declaration which he signed. He did not call for any minister, but no inference is to be drawn from that fact since he was a Jew and there was no rabbi in Ottawa.

Objection was made to the testimony of the assistant State's attorney as to what Levy said and what occurred when the declaration was made because the attorney was engaged in the prosecution, but that fact went to his credibility and not his competency.

The declaration was objected to because the names of two nurses were signed as witnesses to the signature of Levy. The objection is, that the jury would infer that the nurses were witnesses to the facts stated in the paper. The nurses were not present in the restaurant, knew nothing about what happened there and did not pretend to. The jury could not have supposed that the nurses did more than to witness the signature, which plainly appears on the face of the paper.

On the final submission of the case the court was asked to instruct the jury that nothing said or done by the court must be taken by the jury to indicate that the court entertained any opinion whatever on the question whether the statement was the dying declaration of Harry Levy, and the court refused to give the instruction. The jury were instructed, in accordance with the law, with reference to their right to weigh the evidence on the question whether the paper was the dying declaration of Levy, and it was not error to refuse to give them a false statement that the court had no opinion on the subject, when the court could not have submitted the declaration to them without finding, from the evidence, beyond a reasonable doubt, that it was a dying declaration.

The eighth instruction given at the request of the prosecution told the jury that if they believed the defendant not guilty of murder or entertained a reasonable doubt on that question but believed that he unlawfully shot and killed Levy, and the other conditions named in the statute and instruction existed, they should find him guilty of manslaughter. It is objected to because it omitted the requirement that the evidence must establish the facts beyond a reasonable doubt. The defendant's counsel presented to the court more than sixty instructions, and the court gave twenty-five without change and four others as modified. It was necessary that the jury should fully understand that the defendant could not be convicted unless they were con-

vinced of his guilt, by the evidence, beyond a reasonable doubt, but in more than half of the instructions given that doctrine was stated and repeated in every conceivable form. The jury were told that they could not find the defendant guilty if they had a single reasonable doubt of his guilt; that so long as any single reasonable doubt remained from the evidence they must find him not guilty, which assumed that there might be a variety of single and separate doubts as to the one ultimate question whether the defendant was guilty; also that they must presume him to be not guilty at every stage of the proceedings until they agreed upon a verdict; that then the presumption of innocence should still obtain, and that they should ask their inward conscience and get an answer whether they were morally certain of the defendant's guilt or had a doubt about it. The instruction objected to was not for the purpose of directing a verdict or stating the conditions which would authorize one, and would not be so understood, but was given to inform the jury that they might find the defendant guilty of manslaughter although not guilty of murder. It is inconceivable that the jury could have supposed that the instruction had any other purpose.

Instruction No. 17 required proof that the killing of the deceased was absolutely necessary or apparently necessary, and counsel insist that it was error to give it because it was not in harmony with the doctrine of apparent danger. They say that the words "apparently necessary" apply to the killing of Levy and not to the danger of the defendant, and that the appearances mentioned in the instruction were not limited to the defendant and it was not stated to whom the killing must appear to be necessary. The instruction is not subject to the objection and the argument belongs to a class of refinements that have no practical value.

Instruction No. 20 is objected to because it directed the jury to give the defendant's testimony only such weight,

if any, as they believed it entitled to in view of all the facts and circumstances proved at the trial. The objection is to the words "if any," which, it is said, would permit them to give the testimony no weight. But it is the law, and if the jury were satisfied that the defendant was not telling the truth, they were not required to give any credence to his story.

There are some instructions stating the law of self-defense under other conditions than those shown by the evidence in this case, but they are harmless and could not have misled the jury. The simple question involved was whether Levy or the defendant shot first, and the jury were very fully instructed, the instructions for the defendant generally going to the extreme limit of the law and some of them beyond.

Several of the numerous instructions on the subject of reasonable doubt invaded the realm of argument in favor of the defendant. Instruction No. 52, which the defendant procured to be given, is the same as the tenth instruction which was condemned in the case of *Johnson* v. *Farrell,* 215 Ill. 542, with its errors intensified by saying that the testimony of one credible witness is entitled to more weight than the testimony of several others under the conditions named in the instruction, instead of saying that it may be entitled to more weight. The defendant had no cause to complain respecting the instructions.

It is argued that the judgment ought to be reversed because of improper remarks by the State's attorney and his assistant in arguing the case to the jury. The statements are almost wholly by the assistant in the opening argument after conclusion of the evidence, to which counsel for the defendant had full opportunity to reply. The argument was confined to the evidence in the case and in our opinion did not go beyond legitimate bounds.

The evidence warranted the jury in finding the defendant guilty. The circumstances all tended to corroborate

the witnesses for the prosecution. There was a bullet hole through a newspaper lying on the shelf under the counter and through the end of the counter about ten inches from the floor, which could not have been made by Levy with the revolver pointed at the defendant above the counter. That fact is strong evidence of the truth of the dying declaration that when Levy picked up the revolver from the shelf under the counter, as he said he did, in his excitement one shot was made through the paper and the counter. Witnesses who heard the shots testified that the first one was much louder than the three subsequent ones, and the defendant's revolver was thirty-eight calibre while Levy's was thirty-two, and the shot under the counter would not make as loud a noise as the one above. It was a controverted question whether the door was shut, and there was considerable evidence that there was a spring upon the door which would close it unless it was fastened open, which was not done on this occasion. The front and the door were of glass, and if the door was closed Levy could not have fired the first shot, for the reason that the glass door and glass front did not have any bullet hole or bullet mark, and at least the last two shots were at a time when the door was open. If the spring was on the door it would be conclusive evidence against the defendant, but if there was no spring it would not be conclusive that the door was open until the defendant was going out, when Levy was shooting. There is a controversy as to whether the defendant left his coat on the cigar case or hung it near the wash-room door, but that question is not material. We approve of the verdict and judgment.

There was a motion for a new trial based upon the affidavits of the drivers of a laundry and a bakery wagon that there was no spring on the door in working order, but the evidence was cumulative and not conclusive. If there was no spring on the door that would not prove that it was open.

There was an affidavit of the doctor showing that on the morning when the declaration was made Levy was given a hypodermic injection of morphia. That would not overcome the testimony of a number of witnesses that the mind of Levy was perfectly clear when he made the declaration.

There is no prejudicial error in the record, and the judgment is affirmed.   *Judgment affirmed.*