THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. STEPHEN SHINKLE, Defendant-Appellant.

First District (3rd Division)   No. 85—1630

Opinion filed September 9, 1987.

1044

Patrick G. Reardon and Stephen M. Connolly, both of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Kenneth T. McCurry, Paula M. Carstensen, and Joanne M. Roddy, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant Stephen Shinkle was convicted of one count of arson of personal property, one count of arson of real property (Ill. Rev. Stat. 1981, ch. 38, par. 20—1(a)), and one count of conspiracy (Ill. Rev. Stat. 1981, ch. 38, par. 8—2) to commit arson after a jury trial in the circuit court of Cook County. The trial court sentenced him to 48 months' probation, 1,600 hours of public service and a $5,000 fine, which it stayed for two years.

On appeal, he contends: (1) the admission of a police officer's testimony of a conversation between defendant and his coconspirator violated the Illinois Constitution and the Illinois eavesdropping statutes; (2) the trial court improperly allowed the police officer to bolster his testimony with a prior consistent statement prior to cross-examination; (3) the trial court violated his right to confront the witnesses against him when it prohibited him from cross-examining the State's main witness, his coconspirator, concerning his prior unlawful occupation; (4) the State denied him a fair trial when it elicited testimony concerning items which had been suppressed prior to trial.

The State presented two occurrence witnesses at trial. Diane Piagnorelli testified that at approximately 8 p.m. on June 9, 1983, she and her husband observed smoke coming from defendant's chiroprac-

tic office in Oak Park, Illinois, which occupied the first floor of a frame building. She also saw a man emerge from the building and "fiddle" with the doorknob. When her husband told him his house was on fire he responded, "[B]etter call the police." The man then got in a parked car and drove away. Mrs. Piagnorelli wrote down his license plate number and later gave it to the police. Subsequently, she identified Larry Thompson as the man she saw leaving defendant's office on June 9.

Larry Thompson testified that he met defendant in 1981 when he visited him for back treatments and that he and defendant became good friends. Thompson claimed that in April 1983, defendant told him he was not making any money in his practice because of the expense of the new equipment which he had purchased and that if it were destroyed the insurance would pay for it. Thompson told defendant he knew someone who could destroy the equipment in defendant's office for $2,500, $1,000 up front and $1,500 when the job was completed, to which defendant agreed. Thompson went to defendant's apartment on April 23 and received from him the $1,000 down payment and two keys to get in and out of his office. The keys were for the front door and a padlock on metal bars across the door. Thompson told defendant he would contact him to get the $1,500 balance when the job was completed. He called defendant on the afternoon of June 9, at which time defendant told him he thought Thompson had taken the money and "split." Thompson told defendant that the person to whom he had given the money did just that. Defendant told Thompson that he had contacted someone else to "take care of it" since he had not heard from him. Thompson then told defendant that if he could cancel the other arrangement they could work something out for the $1,500 balance. Defendant told Thompson he would get back to him, called him at about 7 p.m., and told him that he had cancelled the other arrangement. Defendant also told Thompson that evening would be a good time to do it because the people who lived upstairs had gone out.

Thompson told defendant he would be right over and left his apartment with a plastic gasoline container which he filled at a gas station at the corner of Plainfield and First Avenues. Thompson put the gasoline container in a box and drove to defendant's office. When he arrived there he met defendant, who took him through the office and showed him what he wanted destroyed. Defendant told Thompson that he especially wanted his X-ray machine destroyed and suggested that they put some containers of the chemicals used to develop the X rays near the machine, which they did. Thompson then showed

defendant how he was going to pour the gasoline on the items he wanted destroyed. Defendant told Thompson to wait 20 to 30 minutes after he left to allow him time to establish an alibi and gave him a phone number to reach him once the job was done in order to arrange payment. After defendant left, Thompson removed a camera, an answering machine, an adding machine and some paintings from the office and took them to his car. Upon his return, he put the front door key in the lock before pouring gasoline throughout the office. Thompson was interrupted when the tenants of the upstairs apartment briefly returned. After they left, Thompson lit the gasoline, which blew up around him. Thompson got out the front door and pushed it shut with his shoulder.

Upon returning to his apartment, Thompson called defendant and told him he had been seen and he thought they had gotten his license plate number. Defendant told him to get rid of the car and get out of the State. Thompson responded that before he did so defendant had to give him the money. They arranged to and did meet the next day at a bar called the Weinkeller and defendant gave Thompson $1,200, which Thompson gave to a friend, Simon Misura, who had accompanied him to the bar. Thompson was arrested on June 18.

Thompson next saw defendant on June 22 in the lobby of the Maybrook court building, where he was to have a preliminary hearing. They met in the restroom and defendant told Thompson that he wanted him to speak to his attorney, asked Thompson not to implicate him, and reassured him that everything would be all right. After their conversation, Thompson spoke to his attorney, who then spoke to someone in the State's Attorney's office. Eventually, Thompson spoke to some people from the office and Oak Park police detective Frank Michalek. He returned to the Oak Park police station with the detective and called defendant to set up a meeting. Detective Michalek listened to the conversation on an extension phone in the same office while holding his hand over the mouthpiece. As a result of the conversation, defendant agreed to meet Thompson the next day to give him the money he owed him. Thompson was indicted on two counts of arson and one count of conspiracy. The State promised him probation in exchange for his testimony against defendant.

Defendant first contends the trial court erred in failing to suppress Detective Michalek's testimony of the telephone conversation between him and Thompson while the detective listened on an extension phone with his hand over the mouthpiece. He asserts that the detective's conduct constituted eavesdropping in violation of the Illinois Constitution (Ill. Const. 1970, art. 1, sec. 6) and section 14—2 of the

Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 14—2). Defendant contends the detective's actions constituted eavesdropping because, without use of the device employed, *i.e.*, the extension phone, he would have heard only the words of one party to the conversation, not the entire conversation.

He argues that the method used in this case to convert an ordinary extension phone into an eavesdropping device was just as effective as that used in *People v. Gervasi* (1982), 89 Ill. 2d 522, 434 N.E.2d 1112, which held that extension telephones with the speaking element removed constituted illegal eavesdropping devices. Defendant cites the emphasis *Gervasi* placed on the functional alteration of a telephone as a factor in the determination whether the extension phone used in that case constituted an eavesdropping device. He distinguishes *People v. Gaines* (1981), 88 Ill. 2d 342, 430 N.E.2d 1046, *cert. denied* (1982), 456 U.S. 1001, 73 L. Ed. 2d 1295, 102 S. Ct. 2285, which held that an extension telephone was not an illegal eavesdropping device, on the ground that the police officer who used an extension telephone to overhear the defendant's conversation in that case did not alter the phone's transmitter in any way. He notes the supreme court's observation in *Gaines* that the eavesdropping statute "is directed against the use of devices other than the telephone itself when the latter has not been functionally altered." 88 Ill. 2d 342, 363, 430 N.E.2d 1046.

Defendant also urges us to look to the "totality of the circumstances surrounding the function of the device" to determine the issue. He argues that an arbitrary fixation on the kinds of devices used will thwart the purpose of privacy laws and exalt form over substance. Defendant urges that the test for "eavesdropping device" should be whether it is used in an obvious effort to dissemble or conceal and with the obvious desire to invade the privacy of communication, which is protected by the Illinois Constitution. He contends the use of the extension phone in this case satisfies that test. He argues that the method used to convert the telephone's function can be analyzed only in light of the purpose of that alteration. Defendant concludes that Detective Michalek's purpose was to eavesdrop and that he created a functional eavesdropping device for that purpose.

The State responds that eavesdropping does not occur where, as here, one of the parties to the conversation gives his consent, citing section 14—2 of the statute. Moreover, it argues, neither a telephone nor an extension phone is an eavesdropping device under our case law, including *Gaines*. It asserts there is no difference between that case law and this case because the listener in each case could easily

speak into the phone and transmit sound and the phones were not functionally altered. It argues it is inconceivable that the legislature could have intended that the simple act of covering the mouthpiece would convert a telephone into an eavesdropping device. The State distinguishes *Gervasi* on the grounds that therein a physical alteration of the extension phone rendered it incapable of transmitting sound, while here the detective merely placed his hand over the receiver and the phone was still capable of transmitting sound. The State asserts that an "intent" test is of no avail here since it concedes the detective's purpose was to overhear defendant's conversation with Thompson. Alternatively, it argues that any error in admitting Detective Michalek's testimony was harmless because it was merely cumulative of Thompson's testimony and because the testimony of one witness is sufficient to support a conviction.

Article 1, section 6, of our constitution provides, *inter alia*: "The people shall have the right to be secure in their persons, houses, papers and other possessions against *** interceptions of communications by eavesdropping devices or other means." (Ill. Const. 1970, art. 1, sec. 6.) Section 14—1 of article 14 of the Criminal Code of 1961 defines an eavesdropping device as "any device capable of being used to hear or record oral conversation whether *** conducted in person, by telephone or by any other means." (Ill. Rev. Stat. 1981, ch. 38, par. 14—1.) Section 14—2 provides, *inter alia*:

> "A person commits eavesdropping when he:
>
> (a) Uses an eavesdropping device to hear or record all or any part of any conversation unless he does so (1) with the consent of all the parties to such conversation or (2) with the consent of any one party to such conversation and in accordance with Article 108A of the 'Code of Criminal Procedure of 1963,' ***." Ill. Rev. Stat. 1981, ch. 38, par. 14—2.

Section 108A—1 of article 108A provides that a circuit judge may grant a prior authorization or approval of the use of an eavesdropping device or a subsequent authorization thereof in an emergency situation where one of the parties to a conversation has consented to its monitoring. Section 108A—6 provides that: in an emergency situation, a law enforcement officer may use an eavesdropping device upon the approval of, or a reasonable effort to contact, a State's Attorney; such use of eavesdropping devices is allowed only where the officer reasonably believes an order permitting the use of the device would issue if a prior hearing were held; an emergency situation exists when, without notice to the law enforcement officer sufficient to obtain prior judicial approval, the conversation will occur within a short

period of time or the device is necessary to protect the officer. (Ill. Rev. Stat. 1981, ch. 38, pars. 14—2, 108A—1, 108A—6.) Finally, section 14—5 of article 14 provides, *inter alia*, that any evidence obtained in violation of the article is inadmissible in any criminal trial. Ill. Rev. Stat. 1981, ch. 38, par. 14—5.

We agree with the trial court that this is "a very close question." Preliminarily, we reject the State's argument that Thompson's consent alone to Detective Michalek's overhearing of the conversation with defendant rendered such conduct legal. The State does not contend, nor could it under the facts of this case, that it has met the requirements of section 14—2 and article 108A to validate the use of an eavesdropping device where only one party to the overheard conversation consented. As such its "consent" argument is meritless.

Ultimately, we believe the emphasis on the "functional alteration" of a telephone as a factor in the determination whether it is an eavesdropping device requires us to hold that Detective Michalek's use of the extension phone rendered it such an illegal device. Both parties agree that the "functional alteration" test controls. However, they disagree whether the placing of a hand over the mouthpiece constitutes such an alteration. Specifically, the State equates "functional alteration" with "physical alteration." In this, the State goes further than the case law requires us to go. In *Gervasi*, the supreme court noted that *Gaines* reaffirmed its holding in *People v. Dixon* (1961), 22 Ill. 2d 513, 177 N.E.2d 224, *cert. denied* (1962), 368 U.S. 1003, 7 L. Ed. 2d 542, 82 S. Ct. 637, and stated:

"We stated in *Gaines* that the basis of *** *Dixon* *** must have been 'that the statute is directed against the use of devices other than the telephone itself *when the latter has not been functionally altered.*' [Citation.] An extension telephone by itself, therefore, is not an eavesdropping device. However, if it has been 'functionally altered' in some manner so that it is no longer capable of performing its customary function it is no longer a telephone.

The function of a telephone is to *transmit and receive sound.* A telephone which is altered so that it can no longer perform one of these functions, *namely the transmission of sound,* is not a telephone but only a listening device. The removal of the transmitter or speaking element from the mouthpiece of each of the telephones made them eavesdropping devices within the meaning of our statute." (Emphasis added.) *People v. Gervasi* (1982), 89 Ill. 2d 522, 526-27, 434 N.E.2d 1112.

It is clear from *Gervasi* that the emphasis must be placed on

whether a telephone used to overhear a conversation is capable, while being so used, of performing its ordinary functions of transmitting as well as receiving sound. Where it cannot transmit sound while it is being used to receive it, it has been rendered an illegal eavesdropping device, regardless of the method used to prevent such transmission. In *Gervasi*, the physical or mechanical alteration by which the extension phones were rendered incapable of receiving sound, *i.e.*, removal of the speaking element from the mouthpiece, was incidental to the functional alteration accomplished by such means. We do not find a sufficient difference between the means used in *Gervasi* and in this case to alter the function of the extension phones in each to hold that the absence of a physical or mechanical alteration distinguishes the two cases.

When Detective Michalek placed his hand over the mouthpiece of the extension phone, he prevented the transmission of sound by the phone as effectively as did the removal of the speaking elements from the phones in *Gervasi*. As such, when he did so, he rendered the extension phone in this case as much of a listening or eavesdropping device as the phones in *Gervasi*. "The distinction drawn in *Gervasi* between telecommunications equipment which can transmit and receive messages, thereby not being an eavesdropping device, and equipment which can only receive messages, thereby being an eavesdropping device, comports with section 14—1 of the eavesdropping statute" (*People v. Bennett* (1983), 120 Ill. App. 3d 144, 148, 457 N.E.2d 986), and thus with the legislative intent behind the statute. In this regard, we reject the State's argument that if the statute is construed to prohibit the mere covering of the mouthpiece, a mute could never be guilty of eavesdropping. This argument ignores that it is not the listener's failure to speak which renders such use of an extension phone eavesdropping but the incapacity of the phone to transmit any sound at all which does so. This incapacity is the proper focus of the inquiry for it is the element which allows the listener to overhear the conversation undetected and thereby violate the constitutional and statutory bars against eavesdropping.

As such, the trial court's failure to suppress Detective Michalek's testimony of the telephone conversation between defendant and Thompson was reversible error. Moreover, we cannot say that it was harmless. While the testimony of one witness may be sufficient to support a conviction, Detective Michalek's corroboration of Thompson's testimony was a crucial factor in the State's case. Without it, we cannot say that Thompson's testimony was sufficient beyond a reasonable doubt to have convicted defendant. Thompson was defend-

ant's coconspirator. As revealed by the State's promise that he would not go to prison if he testified against defendant, he had a great self-interest in testifying strongly against defendant. We cannot speculate as to the weight the jury would have placed on Thompson's testimony without the detective's improper corroboration. However, the weight which the jury did place on this corroboration is revealed by its request, during deliberations, to see Detective Michalek's notes of the phone conversation between defendant and Thompson. Under all the facts and circumstances, the defendant is entitled to a new trial without this illegally obtained evidence.

■ Defendant next contends the trial court committed reversible error when it allowed Detective Michalek to identify the notes he took of the phone conversation between defendant and Thompson for the purpose of "substantiating that he took them." Defendant claims this ruling amounted to the admission of a prior consistent statement for the improper purpose of corroborating the detective's testimony before he was cross-examined. He cites the well-established rules prohibiting such statements absent a charge of recent fabrication or motive to testify falsely. He argues that the record affirmatively reveals this error was prejudicial because Detective Michalek's testimony was the only significant corroboration of Thompson's testimony of the telephone conversation between him and defendant and thus bolstered Thompson's credibility, on which the jury's verdict largely depended. Defendant further argues that this corroboration of the detective's own and Thompson's testimony created a strong possibility that the error contributed to his conviction since " 'corroboration' by repetition[ ] *** preys on the human failing of placing belief in that which is most often repeated." *People v. Sanders* (1978), 59 Ill. App. 3d 650, 654, 375 N.E.2d 921.

Defendant also notes that bolstering testimony by a prior consistent statement is reversible error where a defendant is substantially deprived of a fair trial because the error may reasonably have contributed to his conviction. (*People v. Stout* (1982), 110 Ill. App. 3d 830, 837, 443 N.E.2d 19.) He concludes from *Stout* that the State is estopped from arguing the jury relied only on competent evidence to convict him because its request to see the notes during its deliberations reveals the importance which it placed on them. He further asserts that the improper admission of a prior consistent statement is not harmless error where it cannot be determined whether the jury relied upon it in reaching its verdict (*People v. Hudson* (1980), 86 Ill. App. 3d 335, 408 N.E.2d 325) and that, here, the jury's request to see the notes reveals its actual reliance on the prior consistent statement.

The State responds there was no error concerning Detective Michalek's notes, since they were not admitted into evidence or read to the jury, but were merely identified for the purpose of establishing that he had in fact taken them and then properly used them to refresh his recollection on redirect examination. It asserts that use of the notes to refresh Detective Michalek's recollection as to what defendant said when Thompson asked him about the money did not prejudice defendant since the notes were not read to the jury and the trial court instructed it to consider only the evidence presented. It notes that the trial court refused the jury's request to see the notes and thus prevented it from relying on them in convicting defendant and asserts that defendant's argument to the contrary is purely speculative. Finally, it argues that any error regarding the notes was harmless because the evidence of defendant's guilt was compelling.

In view of our conclusion that Detective Michalek's testimony should have been suppressed as evidence obtained in violation of the constitutional and statutory bars against eavesdropping, we are compelled to conclude that insofar as his testimony was, in the trial court's words, "substantiated" by the notes he took of the conversation between the defendant and Thompson, the reference to the notes constituted reversible error. The State should not have been allowed to do indirectly what it could not do directly.

■ This conclusion notwithstanding, we disagree with defendant that the use of these notes at trial was otherwise improper and prejudicial to him. Preliminarily, we must disapprove of the trial court's allowing Detective Michalek to identify his notes merely "for the purposes [*sic*] of substantiating that he took them" at a point in his testimony when his recollection had not been exhausted. However, we note, as the State contends, that they were never admitted into evidence nor published to the jury and that they were properly used on redirect examination to refresh the detective's recollection. As such, we cannot conclude that the references to them during Detective Michalek's testimony constituted the improper admission into evidence of a prior consistent statement. In each case cited by defendant the prior consistent statement complained of was admitted into evidence and, one way or another, published to the jury. Here, however, while the jury may have been told that the notes contained a substantially verbatim account of the conversation between defendant and Thompson, the jury never heard or read a repetition of Detective Michalek's testimony as to that conversation. As a result, the corroboration by repetition, which the rule against prior consistent statements seeks to prevent, never occurred here. Compare *People v. Sanders* (1978), 59

Ill. App. 3d 650, 654, 375 N.E.2d 921 (by introducing rape complainant's prior consistent written statement into evidence, the State effectively put her in the jury room during its deliberations).

Defendant next contends he was denied the right to confront the witnesses against him when the trial court prohibited him from cross-examining Larry Thompson concerning his prior unlawful occupation as a drug dealer. Defendant cites several cases for the rule that a witness' unlawful and disreputable occupation and activity may be brought out on cross-examination as a matter affecting his credibility. (See, *e.g., People v. Garcia,* (1967), 90 Ill. App. 2d 396, 232 N.E.2d 810.) He argues he should have been allowed to dispel the impression Thompson's testimony made on the jury that he had always been involved in lawful and respectable occupations since the only prejudice involved was that resulting from a denial of his constitutional right of confrontation. He also argues that the trial court's prohibition of this line of questioning also denied him the opportunity to show that the State's main witness may have suffered from mental impairment due to the use of drugs. He cites the well-established principle that a witness' abilities to observe and receive accurate impressions and to remember and relate them correctly are matters which go to his credibility.

Defendant concludes that, under any of the three tests established in *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824, for measuring error, the error in restricting his cross-examination of Thompson was not harmless beyond a reasonable doubt. First, he argues that the error "might have contributed" to his conviction by allowing the jury to attribute more credibility to Thompson's testimony than it deserved. Secondly, he argues that without Thompson's unimpeached testimony there was not "overwhelming evidence" supporting his conviction. Thirdly, he argues that the evidence which he was not allowed to develop was not "cumulative" or duplicative of other "properly admitted evidence."

The State responds that the trial court exercised sound discretion in prohibiting defendant from asking Thompson whether his wife kicked him out of their house four years before the trial for selling drugs, after he testified as to his prior and current employment, since that allegation was totally unsubstantiated. It notes that the scope and manner of cross-examination rest within the sound discretion of the trial court, whose decision will not be reversed absent an abuse of that discretion resulting in manifest prejudice to defendant. (*People v. Guyon* (1983), 117 Ill. App. 3d 522, 532-33, 453 N.E.2d 849.) *Guyon* also noted the well-established rule that a defendant is entitled in

cross-examination to develop all circumstances within the knowledge of a witness which explain, qualify, discredit or destroy his testimony. (117 Ill. App. 3d 522, 532, 453 N.E.2d 849.) The State further notes that, while a prior conviction may be shown to impeach credibility if less than 10 years have passed since the date of conviction (*People v. Montgomery* (1971), 47 Ill. 2d 510, 268 N.E.2d 695), there was no record evidence here that Thompson had been convicted of drug dealing. Moreover, it argues, the jury had sufficient facts to assess Thompson's credibility. As such, it concludes, the trial court properly prohibited defendant from raising the unsubstantiated allegations of drug dealing in cross-examining Thompson.

The State also cites *People v. Hines* (1981), 94 Ill. App. 3d 1041, 419 N.E.2d 420, in support. *Hines* first held that the trial court erred in precluding defendants from questioning a State witness about her occupation as a prostitute. However, the court then observed, citing several United States Supreme Court cases, that: in deciding whether denial of cross-examination violates the right of confrontation, what the defendant was allowed to do, not what he was prohibited from doing, is important; "[t]he issue under the Confrontation Clause is whether the jury has been made aware of adequate factors to determine whether the witness is worthy of belief[,] *** not whether any particular limitation has been placed upon defendant's ability to cross-examine the witness or whether the jury has knowledge of any specific fact"; and, where the entire record reflects that the jury was apprised of adequate factors concerning relevant areas of impeachment, no constitutional issue arises merely because the defendant was prohibited from pursuing other areas of inquiry. (94 Ill. App. 3d 1041, 1047-48, 419 N.E.2d 420.) The court ultimately concluded that no constitutional violation occurred because the defendants were able to bring out significant facts affecting the witness' credibility, including a clear implication that she was a prostitute. (94 Ill. App. 3d 1041, 1048-49, 419 N.E.2d 420.) The State argues implicitly from *Hines* that there were adequate factors here apprising the jury of Thompson's credibility, including his ex-wife's testimony that his reputation in the community was one of false sincerity, despite the trial court's restriction of defendant's cross-examination of him. Therefore, it concludes, defendant was not prejudiced by the limitation of his cross-examination.

Countering defendant's argument that Thompson's unlawful and disreputable occupation as a drug dealer was relevant to show whether he took drugs, the State notes there is no evidence in the record that he took drugs on the night of the arson or any other

night. It also notes that Thompson admitted his illegal conduct and asserts that his occupation was never that of a drug dealer. Finally, the State distinguishes defendant's cited cases as involving a witness' employment at the time of trial, which, as opposed to a prior occupation, is a matter affecting the credibility of a witness.

The right to confront witnesses, which includes both the opportunity to cross-examine them and to have the trier of fact assess their credibility, is fundamental and essential to a fair trial. (*People v. Puente* (1984), 125 Ill. App. 3d 152, 465 N.E.2d 682.) Moreover, it is proper to bring out on cross-examination the fact that a witness engages in an unlawful and disreputable occupation as a matter affecting his general credibility. (*People v. Crump* (1955), 5 Ill. 2d 251, 260, 125 N.E.2d 615; *People v. Winchester* (1933), 352 Ill. 237, 244, 185 N.E. 580; *People v. Newman* (1984), 123 Ill. App. 3d 43, 46, 462 N.E.2d 829.) However, as the State notes, when a defendant alleges denial of the right of confrontation, the issue is whether the jury was made aware of adequate factors to determine the witness' credibility, not whether any particular limitation has been placed on the defendant's ability to cross-examine him or whether the jury has knowledge of any specific fact. 123 Ill. App. 3d 43, 45, 462 N.E.2d 829.

The jury in this case had before it sufficient information to assess Thompson's credibility. On direct examination, he related in detail his role in the conspiracy to set afire, and in the actual setting afire of, defendant's office. Moreover, he admitted he had been promised by the State that he would not go to jail in exchange for his testimony against defendant but would probably only be put on probation. He admitted, on cross-examination, that he did not decide to testify against defendant until he had told his attorney the "whole story," which was only after he had found out that defendant was in the Maybrook court building to appear as a witness against him. These facts adequately apprised the jury of Thompson's self-interest in testifying against defendant and of sufficient facts to assess his credibility.

■ Moreover, that Thompson was an admitted criminal prevented him from appearing to the jury as a person of high character. It is the creation of this appearance through testimony that a witness is engaged in a lawful and respectable occupation when he is, in fact, disreputable and a lawbreaker, which the admission of evidence to the contrary is intended to dispel. (*People v. White* (1911), 251 Ill. 67, 74, 95 N.E. 1036.) Thompson's testimony as a whole dispelled whatever impression of high character his testimony as to his prior lawful occupations may have made on the jury. As such, the trial court was not required to allow defendant to introduce evidence of Thompson's al-

leged former occupation as a drug dealer. Such evidence would have apprised the jury of no facts with which to evaluate his true character and credibility different in nature from those of which it was, in fact, apprised. The trial court did not deny defendant the right to confront the witnesses against him. U.S. Const., amend. VI.

■ Lastly, defendant contends that two questions by the prosecutor to two State's witnesses and the answer to one of the questions deprived him of a fair trial and due process of law. The questions and the answer related to the key to the front door of defendant's office and his appointment book, which had been suppressed before trial as seized in violation of defendant's fourth amendment rights. U.S. Const., amend. IV.

Specifically, defendant complains of a question propounded to Officer Dvonch, an evidence technician, as to what he did after making observations on the front porch of the building housing defendant's office immediately after the fire. Defendant asserts that this question improperly reminded the jury of the key since the prosecutor knew that the key was the only thing that Dvonch had observed on the porch. He contends this reminder was improper because it came immediately after the trial court sustained an objection to a question as to what Dvonch did with regard to the key after noticing it in the front door lock and had instructed the State not to make any further reference to the key. Defendant also complains of a question propounded to Detective Michalek as to where he obtained the names of the defendant's last two patients on the day of the fire and his response that he obtained them from the defendant's appointment book.

Defendant asserts that these improper questions concerning the suppressed items were intentional and made him appear to be attempting to hide evidence by objecting to them. Finally, he asserts that the State cannot violate a defendant's fourth amendment rights and then use the fruits of an illegal search to secure his conviction nor make indirect use of such evidence in its case in chief.

The State first responds that the trial court suppressed only the physical evidence of the key and the lock seized by the police. It asserts that Officer Dvonch's and Detective Toll's "plain view" observations of the key in the front door lock, the latter of which were admitted without objection, did not violate the suppression order since they were made without entering defendant's office and before the items were seized. It notes that the trial court allowed to stand Dvonch's testimony that he noticed a key in the front door lock and struck only the question as to what Dvonch did with the key. To the latter question, Dvonch had answered that he "checked the operation of the lock

with the key in it." The State asserts that the trial court's action with respect to this question and answer and the fact that it made no further references to such testing of the key in the lock prevented any error concerning the key. It further asserts that any error concerning defendant's appointment book was cured when the court sustained his objection to Detective Michalek's testimony about the book. Moreover, it notes that it made no further reference to the book nor introduced any evidence derived from it. As such, it concludes, defendant was not prejudiced by this brief and isolated reference to the appointment book.

Physical evidence found in "plain view" during a criminal investigation is properly admissible at trial. (See *People v. Faine* (1980), 88 Ill. App. 3d 387, 410 N.E.2d 617.) However, in the instant case, the key was suppressed by the trial court and the State has not appealed from that ruling. As such, the State's argument that the police officers' "plain view" observations of the key were admissible at defendant's trial is no justification for its elicitation of testimony concerning the key. Moreover, this argument is no answer to defendant's contention that the question complained of denied him a fair trial because it "reminded" the jury that the only observation Officer Dvonch made on the porch was the key in the lock.

■■ Nonetheless, defendant's failure to object at trial to the question of which he now complains, *i.e.*, "Detective [Dvonch], after making observations on the front porch ***, what did you do?" disposes of this contention. The failure to make a proper and timely objection to the admission of evidence or the propounding of a question constitutes a waiver of the right to object and cures any error. *People v. Boyce* (1977), 51 Ill. App. 3d 549, 561, 366 N.E.2d 914.

■■ Even assuming no waiver, there either was no error in the propounding of this question or it was harmless beyond a reasonable doubt. The trial court had instructed the prosecutor not to make any further references to the key. Asking Officer Dvonch what he did after making observations on the front porch was a logical way of quickly moving away from the subject of the key. Additionally, the defendant had earlier in the trial failed to object to: (1) Detective Toll's testimony that he "noticed a single key" in the lock to the door of defendant's office; (2) the prosecutor's follow-up question to Detective Toll as to what he did after he "noted a key in the door and the door was open"; and (3) Officer Dvonch's testimony that "there was a key in the [front door] lock." In view of the failure to object to these earlier, explicit references to the key, defendant cannot seriously contend he was denied a fair trial because the question complained of

merely "reminded" the jury of the key.

We believe the prosecutor did err when he asked Detective Michalek where he obtained the names of defendant's last two patients on the day of the fire and elicited the response that he obtained them from defendant's appointment book. In contrast to the question relating to the key, this was a direct and explicit reference to evidence which had been suppressed. However, we agree with the State that the trial court's action in promptly sustaining defendant's objection to this testimony, striking the question and the answer, and instructing the jury to disregard them cured any error. (*Cf. People v. Baptist* (1979), 76 Ill. 2d 19, 30, 389 N.E.2d 1200 (act of promptly sustaining objection to improper prosecutorial argument and instructing jury to disregard it is sufficient to cure any prejudice to defendant).) This is the only reference in the record to defendant's appointment book. It was so brief and isolated that it could not alone have denied him a fair trial.

For the reasons above stated, the judgment of conviction entered by the circuit court of Cook County is reversed and the cause is remanded for a new trial consistent with the views expressed in this opinion.

Reversed and remanded.

RIZZI and WHITE, JJ., concur.